**In re DREW P. By Next Friend, Plaintiff,**

v.

**CLARKE COUNTY SCHOOL DISTRICT, Defendant.**

Civ. A. No. 85–119–ATH.

United States District Court,
M.D. Georgia,
Macon Division.

Dec. 23, 1987.

B. Andrew Prince, Gainesville, Ga., for plaintiff.

Andrew H. Marshall, Athens, Ga., for defendant.

FITZPATRICK, District Judge.

Plaintiff Drew P., through his parents and next friends, brought the above-referenced action under the Education for All Handicapped Children Act (EHCA or the Act), as amended, 20 U.S.C. § 1401 *et seq.*, section 504 of the Rehabilitation Act of 1973 (section 504), as amended, 29 U.S.C. § 794, and 42 U.S.C. § 1983. Plaintiffs contend that Defendant School Board failed to provide Drew P. a free appropriate public education as required by federal law. All state administrative remedies had been exhausted prior to the filing of this action. The court's jurisdiction is invoked pursuant to 20 U.S.C. § 1415(e)(2), 29 U.S.C. § 794, 42 U.S.C. § 1983, and 28 U.S.C. § 1343(a)(4).

The case was heard by the court sitting without a jury on September 22, 1987. As they did at the administrative level, Plaintiffs' seek residential placement[1] for Drew whose educational needs, they contend, cannot be met by the current programs available in the Clarke County School District (CCSD). The two questions the court must decide are as follows: first, whether the CCSD deprived Drew of a free appropriate public education by refusing to place him in a twenty-four hour day residential treatment facility; and second, if the court finds that the CCSD did deprive Drew of an appropriate education, what remedy is available to Plaintiffs. The court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

Drew is a 16 year-old multihandicapped child whose condition has been diagnosed

---

1. A residential facility provides shelter, food, special education, and related services twenty-four hours a day. Drew has been living in a residential facility since September, 1985, except for the weeks he was home during the summers of 1986 and 1987.

as a combination of infantile autism and mental retardation. Individuals suffering from autism have been described as

persons, regardless of age, with severe disorders of communication and behavior whose disability became manifest during the early developmental stages of childhood. "Autistic Children" includes, but is not limited to, those afflicted with ... [a] condition characterized by severe defects in language ability ... and behavior and by a failure to relate appropriately to others. The autistic child appears to suffer primarily from profound central processing disorders, i.e., a selective impairment of his cognitive and or perceptual functioning, the consequences of which are manifested by sensory-motor, cognitive, social and language development impediments which reduce the ability to understand, communicate, learn, and participate in social relationships.[2]

Specifically, autistic children exhibit certain behaviors, some of the more common ones being an impaired speech or lack of speech; peculiar body motions, such as incessant rocking or flapping the arms or hands; limpness in the fingers and hands; a lack of desire for affection evidenced by aloneness or withdrawal; gaze-aversion or "looking through" people; and an apparent insensitivity to pain.[3]

The evidence from the state administrative hearing and the trial indicates that throughout his lifetime, Drew has exhibited many behaviors that are characteristic of an autistic child. For example, Drew cannot speak and communicates primarily with limited sign language or by pointing to objects. Drew seems to be very distant in his relationships with people. In addition, he "toe walks" when he is under stress, flaps his hands when excited, and laughs inappropriately. Drew is fascinated by the spinning of mechanical things, has little comprehension of fear or when fear is appropriate, and has difficulty coping with changes in his routine and environment. The evidence also shows that Drew has become increasingly aggressive at home, throws objects when angered, and cannot be left by himself for any significant period of time.

Drew was involved in special education programs offered by the CCSD from the time he was five years old until his parents removed him from the CCSD in January of 1985. While in the local school system, Drew spent much of his time in a classroom for the severely mentally retarded or the severely emotionally disturbed. During his second year in the CCSD, however, Drew was residentially placed at the Georgia Retardation Center and was taught by an individual who had training and experience in working with autistic children. This was the only year Drew was taught by someone trained in the area of autistic children, and Drew's mother, who is a learning disabilities teacher in the CCSD, testified at the hearing that this was the only year in which Drew showed educational progress. From September, 1978 through the spring of 1981, Drew's parents hired a young man, who was working at the Georgia Retardation Center, to live in the home and work with Drew on a daily basis both before and after school.

During 1984 Drew's parents became dissatisfied with the services being offered by the CCSD. The parents believed that Drew required residential placement in an autistic treatment center. Conversely, the officials of the CCSD believed that Drew was making progress in the local system, and that residential placement was therefore unnecessary. The officials did feel, however, that some change in Drew's educational program was needed. In the late summer of 1984, the CCSD began looking for a "foster-type" home in which to place Drew so that he could remain in the CCSD and in the community. After it became

---

**2.** This definition of autism was issued by The National Society for Autistic Children (NSAC), as approved by the NSAC Professional Advisory Board, on January 18, 1975.

**3.** *See* Definition of Autism prepared by Ruth C. Sullivan, Ph.D. of the Autism Services Center.

This definition is a composite of two officially published definitions of the NSAC and is closely followed by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

apparent that efforts to find such a home would yield no satisfactory results, the CCSD suggested that an in-home trainer be provided for Drew at the expense of the Department of Human Resources (DHR). This service was to be provided by the DHR until funding was exhausted.

In the fall of 1984, Cheryl Jordan was hired by the DHR to provide the services of an in-home trainer for Drew. Jordan, who has a degree in special education, worked with Drew for two to three months. Jordan testified at trial that during the time she was with Drew, he was non-compliant, i.e., he could not be guided by verbal command, and he required constant supervision. Jordan further testified that Drew pulled at her clothes when he did not want to obey her instructions, and that she saw Drew pull at his teacher's clothes on several occasions.

Beginning in January of 1985, Drew's parents began searching for a residential placement facility for Drew. Drew's mother contacted the DHR to inquire into the possibility of placing Drew in the Parkwood Developmental Center in Valdosta, Georgia. Parkwood is a residential treatment facility for the mentally retarded. Near the end of January, 1985, Drew was placed in the Parkwood Center on a 30–day trial basis, and Dr. Margaret Hiers was contacted to conduct a thorough evaluation of Drew.

Dr. Hiers is a self-employed evaluator and educational consultant. She earned her Masters and Doctorate degrees in the field of Mental Retardation at the University of Georgia. Dr. Hiers was a public school teacher and a college professor for many years, and was the head of special education at Valdosta State College during the mid–1970s. Dr. Hiers has had several years of experience working with retarded children and with autistic children, both in the United States and in foreign countries.

After conducting her evaluation of Drew, Dr. Hiers concluded that Drew was an autistic child who functions in the mentally retarded range, that he needed concentrated instruction for the remainder of his teen years, and that "the optimal or most appropriate placement is not Parkwood, but a residential center in which the major concentration either for the center as a whole, or for his wing or area of the center, is the instruction of autistic adolescents." [4] Although Dr. Heirs stated in her evaluation that a residential facility would be the "optimal or most appropriate placement," when questioned further about that statement, she testified as follows:

> When I said what I did, I said it that way deliberately, because I feel that Parkwood is an appropriate placement, but I don't think it is the optimal placement. But I do feel it's appropriate. I feel that the public school is only appropriate for the academic instruction. I do not feel it is appropriate for his total educational program. So, that's just my opinion. I put the "optimal" [in] because I did feel that I could say Parkwood—knowing what I knew about it and about his needs —that it was an appropriate placement, but I could not say it was the most appropriate or the optimal placement.[5]

At least two experts testified at trial that autistic children benefit from "sameness" in their environment. In other words, autistic children can become disoriented if any change is made in their environment, and therefore, the educational progress of an autistic child can be enhanced if the child is placed in a program in which the child experiences the same routine, the same objects, and the same activities in an environment that remains unchanged from day to day. Dr. Heirs testified at the state administrative hearing that while an environment of "sameness" can be achieved only through residential placement, such an en-

**4.** Letter from Dr. Margaret H. Hiers (March 13, 1985). Dr. Hier's letter was introduced as Plaintiffs' Exhibit 1 at the proceedings before the Regional Hearing Officer on April 12, 1985, and is included in the Administrative Hearing Transcript (AHT). In addition to the main hearing on April 12, 1985, the Regional Officer heard testimony in this case on June 14, 1985 and July 2, 1985. Transcripts from all three days are included in the AHT.

**5.** Proceedings before the Regional Hearing Officer, July 2, 1985, at pp. 74–75.

vironment is not required during the entire educational life of an autistic child, and may be necessary for only a period of one or two years.[6] In testifying as to why she recommended residential placement for Drew in 1985, Dr. Hiers stated that for Drew "there needs to be for a period of time a comprehensive instructional pattern that absolutely will relate every part of his life to what he's learning if he's going to function in a sheltered workshop."[7]

Following Drew's stay at Parkwood, the parents continued to search for an appropriate residential facility. The record is unclear as to Drew's status from February through August of 1985, but in September of that year, Drew was admitted to the Musashino Higashi Gakuen School in Tokyo, Japan. The Tokyo School is a residential placement facility that works with a large number of both retarded and autistic children. Drew returned to his home in Athens, Georgia for five to six weeks in the summer of 1986 before beginning another year in Tokyo. The following year the Tokyo School started a sister school in Boston, Massachusetts, and after Drew's summer vacation of 1987, he returned to school in Boston. As of the date of trial, Drew was living at the residential treatment facility in Boston.

Drew's mother testified at trial that Drew had made significant progress since his placement in the Musashino Higashi program. She testified that Drew had a purpose in his movement and direction, possessed a heightened level of calmness, and had a much longer attention span than before he entered the Tokyo School. Drew's mother further testified that during the summer of 1987, for the first time, she was able to direct Drew completely by verbal commands. Although Drew's mother

testified he had progressed, the school evaluations of Drew seemed to indicate that Drew actually had regressed in certain areas between March and July of 1987.

The undisputed testimony is that Drew's parents were of the opinion that Drew needed to be placed in a residential treatment facility for autistic children. The CCSD refused to place Drew in such a facility, and maintained that Drew was receiving an appropriate education in the local school system. Following Drew's brief stay at the Parkwood Center and before his placement in the Tokyo school, Drew's parents requested a hearing before a Regional Hearing Officer to determine the placement question. On April 12, 1985 a hearing was held. Following this hearing, the Regional Officer found that the CCSD was providing Drew a free and appropriate education as contemplated under the EHCA, that Drew did not require residential placement in a facility for autistic children, and that the CCSD would not be required to reimburse Drew's parents for any costs incurred by them in placing Drew in a residential facility.[8] On appeal, the State Hearing Officer sustained the decision of the Regional Hearing Officer.[9] Following the final decision of the State Hearing Officer, Plaintiffs filed the present action in this court.

At the state administrative hearing and at trial, the CCSD relied heavily on the testimony of Drew's teachers that Drew was making substantial progress toward the goals established for him in his individualized education programs (IEP).[10] An IEP is a written statement for a handicapped child which includes a statement of the child's present level of educational performance, a statement of annual goals, a

---

6. Proceedings before the Regional Hearing Officer, July 2, 1985, at pp. 16–17 (testimony of Dr. Hiers).

7. Proceedings before the Regional Hearing Officer, July 2, 1985, at pp. 55–56 (testimony of Dr. Hiers).

8. Decision of Colquitt P. Brackett, Jr., Regional Hearing Officer, July 27, 1985. A copy of this decision is included in the AHT.

9. Decision of L.O. Buckland, State Hearing Officer, in *Drew P. v. Clarke County Bd. of Educ.*, Case No. 1985–28. A copy of this decision is included in the AHT.

10. Under the EHCA the parents of the handicapped child meet with educational authorities to develop an IEP for the child. 20 U.S.C. § 1401(19). The parents can later challenge the appropriateness of the IEP. *See* 20 U.S.C. § 1415(b), (c).

statement of the specific services to be provided to the child along with the projected dates for the initiation and duration of the special services, and a list of objective criteria that can be used to evaluate the child's progress toward the annual goals.[11] The purpose of the IEP is to develop a plan of education that is appropriate to meet the particular needs of the handicapped child.

The IEPs developed for Drew during the years 1982 through 1985 indicated that Drew was making some progress in the special programs provided by the CCSD. In fact, on the May 12, 1983 IEP, Drew's teacher stated that Drew had progressed "significantly" in the areas of interaction with peers, communication, and fine motor development. CCSD also relied on the fact that Drew's parents helped develop the IEP for the 1984–85 school year and made no objection to the goals set forth in the IEP or the proposed placement for Drew.

Although Drew's teacher stated on the May 12, 1983 IEP that Drew had made "significant" progress, it appears that Drew was working on many of the same things in 1984 that he had been working on in 1983.[12] Moreover, Drew's mother testified that while Drew may have been making some progress at school, he was not transferring what he had learned at school to the home environment. Mrs. P. also testified that when Drew was at home, he was unable to perform those tasks listed in his IEP, was not achieving the goals listed in his IEP, and in her opinion, was not developing in a manner that would allow him to live a life outside his parents' home. Mrs. P.'s testimony that Drew was performing differently at school than he was at home is consistent with expert testimony at trial to the effect that a change in an autistic child's environment frustrates the child and inhibits progress. Mrs. P. added that Drew now had the ability to overpower her, had become increasingly aggressive, and had developed the habit of continually grabbing food from his younger sis-

ter's plate. Drew required constant supervision at home because of his insensitivity to danger.

At trial the CCSD presented the testimony of two members of the CCSD Special Education Staff. These two individuals had prepared a hypothetical educational placement plan that could have been offered to Drew if he returned to the CCSD. The plan contemplated the placement of Drew in a single classroom with three other students who were mentally retarded, but who had similar mental ages as Drew. Because of the hypothetical nature of the plan, the evidence is insufficient to determine whether such a plan would meet the educational needs of Drew.

In addition to testimony that was similar to that presented at the administrative hearing, Plaintiffs introduced the videotaped deposition of Dr. Lee Marcus, a psychologist and faculty member at the University of North Carolina School of Medicine. In conjunction with his work at the University, Dr. Marcus is the clinical director of the Piedmont TEACCH Center.[13] TEACCH is a program sponsored by the State of North Carolina which serves autistic individuals and their families through diagnostic and assessment methods, parental counseling, and school consultation. Drew has been evaluated at the TEACCH Center on two separate occasions. Both sides agree that Dr. Marcus is an authority on the education of autistic children.

The court was unable to consider Dr. Marcus' testimony until after the trial. After reviewing the videotaped deposition, the court felt that while Dr. Marcus' testimony could be a valuable guide in the resolution of this case, the deposition failed to shed sufficient light on Dr. Marcus' views of residential placement for autistic children. The court prepared a list of additional questions for Dr. Marcus, and both sides agreed to a supplemental telephonic deposition of Dr. Marcus. Under this procedure, a con-

---

**11.** 20 U.S.C. § 1401(19).

**12.** Proceedings before the Regional Hearing Officer, April 12, 1985, at pp. 141–46 (testimony of Sharon Swaim).

**13.** TEACCH stands for Treatment and Education of Autistic and Related Communications Handicapped Children.

ference call was arranged during which Dr. Marcus answered the questions put to him by the court, and each attorney was given an opportunity to question Dr. Marcus about his answers.

In response to the court's question, "[i]s twenty-four hour care in a residential placement facility necessary for an autistic child to achieve educational progress?," Dr. Marcus responded as follows: "I would say not for every autistic child; certainly for some, a twenty-four hour care is necessary and my understanding and history that we've had with [Drew's] case over the years, I'd say that that *is* necessary for Drew." [14] The court also asked Dr. Marcus whether twenty-four hour residential placement was the optimum situation for an autistic child such as Drew, or the minimum that a severely autistic child would require to make progress. Dr. Marcus had stated earlier that Drew's autism problem was severe,[15] and he responded to the court's question as follows:

> In one sense it's optimum because I think you can't do better than having twenty-four hour [placement]. On the other hand, I think it's realistic and apropriate [sic]. So, optimum may imply that it's ideal. I would argue that it's not a question of ideal, it's a question of what's needed.[16]

The unequivocal response of Dr. Marcus to the court's last question is indicative of his understanding of what is required for the educational progress of severely autistic children.

> The court: Based on your knowledge of Drew's condition, would you say whether or not you feel that residential placement is necessary for him to achieve educational progress, and we earlier talked about the difference between the optimum or the best situation, and the kind of floor situation, and I want you to direct it not towards

the best situation, but towards the floor, so to speak, for him to achieve educational progress.

> Dr. Marcus: Yeah, I think it's necessary.[17]

Throughout the remainder of the telephonic deposition, Dr. Marcus seemed to stress two points. First, Dr. Marcus' testimony reveals that he thinks an autistic child benefits from interaction in a public school setting. In Drew's case, however, Dr. Marcus testified that while time in the public school was good, the learning process must be extended beyond the eight-hour day that a public school special program could provide. Dr. Marcus stated that, "[Drew] is the kind of youngster who needs the more integrated full day and weekends and summer and all that to progress properly." [18] Second, Dr. Marcus cited the importance of having a teacher that is trained to work with autistic children. On two different occasions, Dr. Marcus testified about the importance of teacher training.

> ... unless [the] teacher has a full grasp of Drew's autism problems, as well as the mental retardation problems, then that might jeopardize the possibility of progress.[19]

> \* \* \* \* \* \*

> ... I can't imagine anyone who does not have experience or some training with autistic children being able to help that child unless they were extraordinarily gifted and intuitive and there are very few people like that.[20]

Finally, the court notes the testimony of Dr. Peter Thomas, who was called as an expert witness for the CCSD at trial. Dr. Thomas is a licensed psychologist and a school psychologist licensed by the Department of Education of the State of Georgia. In preparing a diagnosis of Drew, Dr. Thomas concluded that Drew functioned in

**14.** Court's Telephonic Deposition of Dr. Lee M. Marcus, October 22, 1987, at p. 2.

**15.** *Id.* at 2.

**16.** *Id.* at 3.

**17.** *Id.* at 9–10.

**18.** *Id.* at 18.

**19.** *Id.* at 5.

**20.** *Id.* at 20.

the severely retarded range and met the criteria for having infantile autism. After reviewing much of the evidence available before trial, Dr. Thomas stated that Drew required an educational program with a small teacher-pupil ratio which should be highly routinized. The thrust of Dr. Thomas' testimony, however, was that Drew did not require twenty-four hour a day residential placement to benefit from an educational program.

## II. CONCLUSIONS OF LAW

The court begins its inquiry by noting the unique factual situation presented in this case. Drew is an individual who is suffering from two handicaps which adversely impact each other. Those skills Drew may have been learning in the CCSD were not being transferred into the home environment, and the ability of Drew's parents to control him at home decreased as he grew older. Accordingly, the court's ruling is not meant to be stretched beyond the narrow bounds established in this case.

### A. *The EHCA*

 Plaintiffs are seeking residential placement for Drew and reimbursement under the Education for All Handicapped Children Act.[21] The EHCA provides federal money to assist states and local agencies in furnishing educational services to handicapped children. Although the Act supplies financial assistance to those states that comply with its provisions, the Act also imposes certain duties and obligations on the state and local agencies receiving the funds. Perhaps the most important responsibility of those states receiving funds is to effect "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The Act defines a "free appropriate public education" as follows:

> special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(18). As used in the definition of a "free appropriate public education," the term "special education"

> means specifically designed instruction, at no cost to parents or guardians, *to meet the unique needs of a handi-*

---

21. Plaintiffs also have requested relief pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794. This court notes, however, that Plaintiffs need not rely on section 504 as an alternative basis for relief. Every substantive right Plaintiffs claim has been violated is protected under the provisions of the EHCA. Moreover, the relief Plaintiffs seek is available under the EHCA. The Supreme Court recently held that a plaintiff who asserts a valid claim under the EHCA cannot also proceed under the Rehabilitation Act. *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *see also Georgia Ass'n of Retarded Citizens v. McDaniel*, 740 F.2d 902 (11th Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1128, 84 L.Ed.2d 365 (1985). Accordingly, the court will not address Plaintiffs' section 504 claim.

The court notes that the portion of *Smith* which held that attorney's fees are not recoverable under either the EHCA or the Rehabilitation Act has been modified by recent federal legislation. See 20 U.S.C. § 1415(e)(4)(B) (Supp.1987) (in any proceeding brought under this subsection, the court may use its discretion to award reasonable attorney's fees).

Plaintiffs also made a broad allegation in the Complaint that the Defendant had violated Plaintiffs' "Constitutional and Statutory rights," and invoked 42 U.S.C. § 1983 as a basis for relief. The court, however, has neither seen nor heard of a violation of any constitutional right throughout the course of these proceedings. If such a violation under section 1983 did exist, it would necessarily be an equal protection claim and not a due process claim, since Plaintiffs have conceded that Defendant has abided by the procedural requirements set forth in the EHCA. In the *Smith* case, the Supreme Court held that where a handicapped child asserts a right to a free appropriate public education, and the EHCA is available, a claim based either on the EHCA or on the Equal Protection Clause may be brought only under the EHCA. *Smith*, 468 U.S. at 1008–09, 104 S.Ct. at 3466–67; *Manecke v. School Bd. of Pinellas County, Florida*, 762 F.2d 912, 918 (11th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986). Therefore, this court concludes that Plaintiffs are not entitled to relief under section 1983.

*capped child,* including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions.

20 U.S.C. § 1401(16) (emphasis added). The term "related services" is used to denote those developmental, corrective, and other supportive services that "may be required to assist a handicapped child to benefit from special education." 20 U.S.C. § 1401(17).

■ Although the Act does not specifically mention residential placement as a component of special education or related services, the regulations promulgated under the Act resolve any possible doubt as to whether residential placement can be required under the Act.

If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302 (1986).

The Supreme Court has established specific parameters for district courts to follow when determining whether the state has provided a free appropriate public education to a handicapped child. *Bd. of Educ. of Hendrick Hudson Central School Dist. Bd. of Educ., Westchester County v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). As noted by the Court, an appropriate education for a handicapped child generally is outlined in the child's IEP. *Id.* at 181–82, 102 S.Ct. at 3038. The program set forth in the IEP must provide the child with a "basic floor of opportunity" consisting of access to the specialized instruction and related services designed to provide an educational benefit to the handicapped child. *Id.* at 201, 102 S.Ct. at 3048.

The *Rowley* Court rejected the argument that the Act requires a state to "maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." *Id.* at 200, 102 S.Ct. at 3048. The Court concluded that the primary intent of Congress was to

identify and evaluate handicapped children, and to provide them with access to the type of free public education that would be "sufficient to confer some educational benefit upon the handicapped child." *Id.* As recognized by the Court, however, the determination of when a handicapped child is receiving sufficient educational benefits as required by the Act can present a difficult problem, the resolution of which will vary from case to case. *Id.* at 201–02, 102 S.Ct. at 3048–49.

To insure that those states receiving federal money do not neglect their obligation to provide a free appropriate public education to the handicapped, the Act provides certain procedural safeguards. Parents have a right to participate in the development of a child's IEP, and they have the right to complain about any matter relating to the provision of a free appropriate public education for their child. If the parents wish to file a complaint, they have the right to an impartial due process hearing before an individual who is not an employee of the agency or local unit involved in the education or care of the child. 20 U.S.C. § 1415(b)(2). If such a hearing is conducted by a local educational agency, any aggrieved party is entitled to an impartial review of the hearing by the state educational agency. 20 U.S.C. § 1415(c). Any party aggrieved by the decision of the state agency may file suit in a state court of competent jurisdiction or in a federal district court without regard to the amount in controversy. 20 U.S.C. § 1415(e)(2).

With respect to the district court's duty to review the decision of the state agency, the Act provides as follows:

the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of the party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*Id.* The Supreme Court in *Rowley* concluded that a district court's inquiry under section 1415(e)(2) is twofold: first, the court must determine whether the state has complied with the procedures set forth in the

Act; and second, the court must decide whether the individualized educational program is reasonably calculated to enable the child to receive educational benefits. *Rowley* at 206–07, 102 S.Ct. at 3051. Although a district court has the authority to make independent decisions, it must give the state administrative hearings due weight. *Id.* at 206, 102 S.Ct. at 3051.

■ The issue for this court, then, is whether Plaintiffs have shown by a preponderance of the evidence that the failure of the CCSD to change Drew's IEP and provide Drew with residential placement has denied Drew sufficient access to a free appropriate public education through which Drew can achieve some educational benefit. After a thorough review of the administrative record in this case and the evidence presented in connection with the trial, the court concludes that Plaintiffs have satisfied their burden that the CCSD deprived Drew of a free appropriate public education by refusing to place Drew in a residential treatment facility.

Several factors have convinced this court that residential placement is necessary if Drew is going to obtain an appropriate education as defined by the Supreme Court in *Rowley*. The court notes that residential placement has been recommended for Drew on a number of occasions in the past. When Drew was 3½ years old, he was evaluated at Emory University and diagnosed as suffering from autism and severe mental retardation. Residential placement was suggested at that time.[22]

On June 7, 1984, while Drew was still in the CCSD, Drew's mother filed an application with the Developmental Services Unit of the Northeast Georgia Community Health—Mental Retardation Center asking that Drew be placed in a residential facility. When the application was made, the Center reviewed Drew's records and conducted meetings with school officials to determine whether residential placement was needed. Although officials at the Center concluded that Drew should remain in the CCSD, they recognized that some change was needed. Their recommendation was that a referral be made to the residential services department in the State, and that funds be gathered to establish a developmental training home in which Drew could be placed. They also recommended that an in-home trainer be provided until a developmental home was established. The evidence shows, however, that neither the CCSD nor the State of Georgia provided the type of home the Center had recommended.

Following Drew's stay at the Parkwood Facility in Valdosta, Georgia, both Dr. Margaret Hiers and the officials at Parkwood concluded that placement in a residential facility was necessary to meet the needs of a severely autistic adolescent such as Drew.

In addition to the fact that residential placement has been recommended for Drew, the court notes other cases dealing with autistic children in which residential placement was ordered. *See e.g., Stacey G. v. Pasadena Independent School Dist.,* 695 F.2d 949 (5th Cir.1983); *Parks v. Pavkovic,* 536 F.Supp. 296 (N.D.Ill.1982), *aff'd in part, rev'd in part,* 753 F.2d 1397 (7th Cir.1985); *Armstrong v. Kline,* 476 F.Supp. 583 (E.D.Pa.1979), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). Although the court is well aware that determinations regarding residential placement must be made on an individualized, case-by-case basis, it is worthwhile to note that courts have upheld residential placement for children with disabilities similar to Drew's. Moreover, in the cases mentioned above, the children already had been residentially placed by the state, and the issues involved focused either on the period of time of the placement, or the source of payment for the placement.

The court also is persuaded by the testimony of Drew's mother in which she stated that before Drew was residentially placed, he was unable to perform any of his IEP tasks at home, was becoming increasingly

---

**22.** *See* Psychiatric Evaluation regarding Drew P. prepared by A. Allison Grant, M.D. on March 24, 1981. Dr. Grant's Evaluation was introduced as Plaintiffs' Exhibit 3 at the proceedings before the Regional Hearing Officer and is included in the AHT.

aggressive, and at times was difficult to control. This testimony is in accord with the expert testimony presented at trial, in which both Dr. Hiers and Dr. Marcus stated that autistic children have a very difficult time transferring skills from one environment to another, and that "sameness" is an important element in an autistic child's ability to progress. Drew's mother also testified that after Drew returned from the Tokyo School, he was calmer and could be directed by verbal command. Moreover, Marty Johnston, who observed Drew in a physical education program during the summer of 1987, testified that Drew had changed dramatically since she had worked with him in the summer of 1984. Johnson testified that while Drew's behavior in 1984 almost precluded him from participation in the program, when she observed him in 1987, Drew could be verbally directed, and he was much more cooperative during group activities.

Finally, the factor that this court finds most persuasive in making its determination is the testimony of Dr. Lee Marcus. The court recognizes that neither the Regional Hearing Officer nor the State Hearing Officer had Dr. Marcus' testimony before them at the time of their decisions. Dr. Marcus' testimony has been discussed at length above, and the court will not now reiterate what already has been written. The court will add, however, that during the deposition, Dr. Marcus stated that he had sufficient contact with Drew and knowledge of Drew's condition to allow him to accurately assess whether residential placement was warranted. Dr. Marcus further testified that while resi-

dential placement was not appropriate for every autistic child, it was needed in Drew's situation.

## B. Remedy

■ Plaintiffs have asked for reimbursement for all expenses incurred in obtaining residential placement for Drew, attorney's fees, and residential placement for Drew until he reaches 21 years of age.[23] The EHCA gives a district court the authority to grant the type of relief requested by the Plaintiffs. The Eleventh Circuit recently stated that in deciding whether reimbursement should be given in a particular case, the district court should balance the equities and determine what amount if any would be appropriate. *Jenkins by and through Jenkins, v. State of Florida*, 815 F.2d 629, 631 (11th Cir.1987).

Although the State Board of Education of Georgia is not a party in this suit, the court recognizes that the ultimate responsibility for complying with this court's Order of relief will fall on the State. Section 1412(6) of the EHCA expressly dictates that the state educational agency is responsible for ensuring compliance with the Act.[24] Because the CCSD is the only party defendant in this suit, however, the court's Order must be directed to the local school board.

As enumerated above, the court finds that residential placement is necessary if Drew is going to receive a free appropriate public education. Under the authority of section 1415(e)(2) of the EHCA, a district court can direct a local educational agency to provide the necessary special educational

---

**23.** 20 U.S.C. § 1412(2)(B) provides in pertinent part:

a free appropriate public education will be available for all handicapped children between the ages of three and eighteen within the State not later than September 1, 1978, and for all handicapped children between the ages of three and twenty-one within the State not later than September 1, 1980

**24.** Section 1412(6) provides as follows:

The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such pro-

grams administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet education standards of the State educational agency. This paragraph shall not be construed to limit the responsibility of agencies other than educational agencies in a State from providing or paying for some or all of the costs of a free appropriate public education to be provided handicapped children in the State.

20 U.S.C. § 1412(6) (Supp.1987).

services required for a handicapped child to receive a free appropriate public education. *Burlington School Comm. v. Dept. of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Accordingly, this court orders the CCSD to provide Drew with residential placement until the age of 21, or in the alternative, to pay for placement in a residential facility that has been mutually agreed upon by Drew's parents and school officials of the CCSD.

■ The court now turns to the issue of reimbursement. The Supreme Court recently held that the EHCA authorizes a court to reimburse parties for special education if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act. *Burlington* at 367–69, 105 S.Ct. at 2002–03. Since this court finds that Drew's parents were justified in placing him in a residential facility, the court has the authority to order reimbursement to the parents.

The court, however, is troubled by the fact that Drew's parents chose a residential facility 8,000 miles from home in which to place Drew. Although the State of Georgia may not have an appropriate residential facility for autistic children, certainly one should not need to traverse the Pacific Ocean to find an adequate residential facility for children with disabilities similar to Drew's. Conversely, the court notes that the State of Georgia did not and does not now provide an appropriate treatment facility for severely autistic children who have passed the age of twelve.[25] The court further recognizes that while attempts were made to gather funds to begin a developmental home in which Drew could live, no such home was ever established.

After balancing the equities in this case, the court feels that while Plaintiffs should receive some reimbursement, they are not

entitled to reimbursement from January, 1985. At this time, however, the court does not have sufficient evidence before it to address the issue of reimbursement. The court orders that Plaintiffs submit an itemized statement of the costs incurred in placing Drew in residential facilities, along with an itemized statement of the amount of attorney's fees Plaintiffs are seeking. Following receipt of these statements, the court will issue a supplemental Order addressing the issues of reimbursement and attorney's fees.

In issuing this Order in which the court finds that residential placement is necessary for Drew, the court does not mean to imply that the school in Boston is the appropriate place for Drew. As stated in Plaintiff's Post–Trial Brief, group homes for autistic children are available in North Carolina. Moreover, the parents have stated that they would be willing to place Drew in one of those homes. The court hopes that the parties can agree on the proper placement for Drew at the end of his term in Boston. It is the court's belief that the parties can come to a mutually acceptable arrangement that would include appropriate placement for Drew at a minimum cost to the CCSD.

■ The court understands the importance of this decision and the burden it places on the local school district involved.[26] Thus, the court finds it necessary to emphasize that this decision is limited to the unique situation involving a severely autistic child suffering from severe mental retardation. As Judge Williams of the Fifth Circuit has stated, federal courts should be reluctant to expand the scope of the EHCA "simply because they honestly and very properly feel sorry for the claimants." *Stacy G.*, 695 F.2d at 956 (Williams, J. concurring). The evidence in the present

---

25. Proceedings before the Regional Hearing Officer, April 12, 1985, at p. 36 (testimony of Drew's mother).

26. Other courts also have recognized that the unequivocal congressional directive to provide an appropriate education for all handicapped children places a substantial burden on states in certain instances. *See e.g., Smith,* 468 U.S. at

1020, 104 S.Ct. at 3473; *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 695 (3d Cir. 1981). As stated by the court in *Kruelle,* however, the educational agencies of the state are required to furnish the services necessary to provide a handicapped child with an appropriate education "regardless of financial and administrative burdens." *Kruelle,* 642 F.2d at 695.

case, however, strongly indicates that Drew cannot progress absent residential placement. Therefore, this court is simply giving Drew what he is entitled to under the EHCA, the right to enjoy a free appropriate public education.

Accordingly, the court finds for the Plaintiffs and directs the CCSD to implement an IEP placing Drew in an appropriate residential facility for autistic children. The court will defer its ruling on reimbursement and attorney's fees until it receives additional documentation as requested in this Order.