Stanley E. ASH, Barbara Ash and Christopher Ash, a minor by and through his natural parents, Stanley E. Ash and Barbara Ash, Plaintiffs,

v.

**LAKE OSWEGO SCHOOL DISTRICT NO. 7J, Defendant.**

Civ. No. 90–746–FR.

United States District Court, D. Oregon.

May 31, 1991.

School District (LOSD) in Clackamas County, Oregon.

In August, 1981, Christopher was evaluated by the Clackamas County Educational Service District (ESD) and referred to the mentally retarded, developmentally delayed (MR/DD) playschool program conducted by the ESD. On September 8, 1981, Stanley Ash signed a release to permit Christopher to participate in the MR/DD playschool program through the ESD. On the front of the release was the statement: "See the back of this page for a copy of your legal rights." On the back of the release was a list of the procedural safeguards for parents, including their right to initiate an impartial due process hearing related to any aspect of the individualized educational program (IEP) prepared for their child.

An IEP was prepared for Christopher by a child study team on November 9, 1981. Thereafter, Christopher was placed in the MR/DD playschool program for children administered by the ESD.

In June, 1982, Christopher was evaluated by Dr. Thomas Nakata, a psychiatrist, who diagnosed his condition as infantile autism. Autism is a chronic disorder which manifests during early childhood and which severely affects the communication abilities and the behavior of a child. Autism includes disturbances of 1) the developmental rates and/or sequences of a child; 2) the ability of a child to respond to sensory stimuli; 3) the speech and language and ability to communicate of a child; and 4) the capacity of a child to relate to people, objects and events.

On August 3, 1982, Dr. Nakata and another doctor referred Christopher to the District and Regional Assessment Center (DRAC) of the Portland Public Schools for evaluation. On September 1, 1982, personnel from the DRAC notified Patrick Highhouse, Director of Special Services for the LOSD, of the referral. On October 11, 1982, Stanley Ash signed a "Prior Notice and Parent Consent for Evaluation" from the Special Education Program of the Port-

Robert F. Blackmore, Dunn, Carney, Allen, Higgins & Tongue, Portland, Or., for plaintiffs.

Thomas S. Moore, Portland, Or., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRYE, District Judge:

Plaintiffs, Stanley E. Ash, Barbara Ash and Christopher Ash, bring this action under the Individuals with Disabilities Education Act (the Act),[1] as amended, 20 U.S.C. § 1401 *et seq.*, alleging that the defendant, Lake Oswego School District No. 7J, has failed to provide a free, appropriate public education to Christopher Ash as required by federal law.

## FACTS

Christopher Ash, the son of Stanley and Barbara Ash, was born on August 23, 1978. The Ashes reside in the Lake Oswego

---

**1.** This Act was amended effective October 30, 1990 by section 901(a)(3) of Pub.L. 101–476 and was formerly known as the Education for All Handicapped Children Act.

land Public Schools, which listed the legal rights of parents on the back including the right of parents to request an impartial due process hearing. On October 12, 1982, the evaluation team from the DRAC concluded that Christopher was eligible for special education services under the category of autistic.

On November 15, 1982, the Director of Special Education for the ESD completed a form indicating that Christopher's parents wanted to have him evaluated at DRAC for placement in the autistic preschool classroom in Portland, Oregon, and the form stated that the parents would withdraw him from the MR/DD playschool program effective September, 1982.

On November 17, 1982, Highhouse met with Stanley and Barbara Ash. Highhouse explained that students with autism generally receive services through the regional program at the Kelly Center. The Ashes were interested in learning about the regional program at the Kelly Center, but were also considering placing Christopher in a regular playschool with a full-time tutor.

At about the same time, Christopher began treatment with Dr. Douglas Golden who offered specialized play therapy. Dr. Golden also worked with the Ashes in dealing with Christopher and the problems his condition and his needs were causing in the family. Dr. Golden worked with Christopher regularly until May, 1983 and thereafter occasionally until July, 1985.

The Ashes decided to enroll Christopher in a Montessori School. They hired a tutor, who was a special education specialist, to accompany Christopher and to assist him in school.

On August 23, 1983, Christopher became five years old, and therefore eligible for public education under Pub.L. 94–142. Christopher was attending the Montessori School at that time, and his parents did not enroll him in a public school in the LOSD in 1983. The LOSD made no effort to locate him in 1983.

In the spring of 1984, an administrator from the Montessori School told Stanley Ash that Christopher was "getting kind of big" in comparison with the other students and that his behavior could sometimes be very disturbing in the classroom setting. She recommended that Stanley Ash talk to Highhouse. Stanley Ash made a brief, unscheduled visit to Highhouse to ask whether Christopher could attend a public school with his tutor. Highhouse said it would be inappropriate to bring a private instructor into a public school. Stanley Ash felt that "that was the end of the line." Transcript of Hearing, Vol. 2, p. 502. The Ashes did not contact Highhouse again about Christopher's education until January, 1989.

Christopher remained at the Montessori School with a tutor until the summer of 1985. By that time, Christopher's behavior at home had become a serious problem. He was having severe tantrums almost every day and had put his hand through a window. Barbara Ash told Dr. Golden that she thought she would have a nervous breakdown if Christopher remained at home. Dr. Golden agreed with the Ashes that residential treatment was necessary because of Christopher's behavior and its effects on the family.

In September, 1985, the Ashes placed Christopher in the Tokyo Higashi School, a residential school for autistic children. In 1987, the founder of the Tokyo Higashi School opened the Boston Higashi School in Boston, Massachusetts. Christopher was transferred to the Boston Higashi School from the Tokyo Higashi School. Christopher continues to reside in the Boston Higashi School.

The Boston Higashi School offers a program called Daily Life Therapy. Daily Life Therapy emphasizes the building of physical strength and the development of those skills necessary for daily living. Children are taught in groups, but they receive intensive individual attention.

In September, 1987, Christopher's brother began to receive special education services from the LOSD. In connection with the services provided to Chrisopher's brother, the Ashes received written notice of their legal right to obtain special education

services for Christopher in the LOSD three or four times in 1987 and in 1988.

In January, 1989, Stanley Ash learned from other parents that the local school district of an autistic child would pay part of the expenses for a child residing at the Boston Higashi School. Stanley Ash met with Highhouse on January 18, 1989 to discuss the possibility of being reimbursed for the expenses of educating Christopher at the Higashi Schools and to learn what the LOSD was doing to educate autistic children. Highhouse suggested that Christopher be evaluated. He gave Stanley Ash literature, including copies of the policies and regulations applicable to the LOSD. Highhouse agreed to inquire about reimbursement for the Ashes, and Stanley Ash agreed to provide Highhouse with information from the Boston Higashi School. On March 9, 1989, Stanley Ash sent Highhouse the IEP prepared for Christopher by the Boston Higashi School.

On March 17, 1989, Highhouse advised the Ashes that tuition reimbursement equal to the costs that would be incurred by the LOSD to educate Christopher in the LOSD was not an option at that time given that the LOSD had not participated in any of the procedural safeguards available to Christopher. Highhouse explained that the LOSD needed to evaluate Christopher and prepare an updated IEP in order to determine Christopher's eligibility for services.

On May 3, 1989, Robert Blackmore, an attorney for the Ashes, contacted the Superintendent of the LOSD, William Korach, to formally request an evaluation of Christopher and the development of an IEP for him. Christopher returned home from the Boston Higashi School in July, 1989, and an evaluation of Christopher was completed on August 22, 1989.

The evaluation of Christopher included an interview with the Ashes, a cognitive evaluation of Christopher, behavioral observations of Christopher at his home, a home visit, a speech and language evaluation, audiological screening, and an academic evaluation. The evaluators concluded that 1) Christopher had virtually no language form with which to communicate

since he had a vocabulary of only five words; 2) Christopher's adaptive behavior was at the level of a child two years and three months old; 3) Christopher's motor skills were significantly below expectation; and 4) Christopher's visual attention span was extremely short. The evaluators did not find significant self-destructive behavioral problems.

On September 6, 1989, Highhouse and the evaluation staff discussed these results with Stanley Ash and advised him that Christopher was autistic and eligible for the special education services provided for autistic children by the LOSD. It was not determined at this meeting whether Christopher was eligible for the services that the ESD provides for retarded, autistic children in self-contained classrooms in the public schools. Prior to this discussion, Christopher had returned to the Boston Higashi School.

There are no placement options available in the ESD for children who require residential placement in order to be provided an appropriate education. Residential placement options within the State of Oregon include one group home, possible foster care, and short-term placement in state facilities.

On September 13, 1989, Stanley and Barbara Ash attended a conference regarding Christopher's IEP with Highhouse; Devon Welch–Homes, a consulting teacher; Julie Dunn, a speech pathologist; and Colleen Nyberg, a consultant on autism. Individual goals and objectives for Christopher were developed. The Ashes approved these goals and objectives. They asked that the IEP be typed and sent to their home. The Ashes told Highhouse to put the recommendation for the placement of Christopher, which had not been discussed yet, in writing and send it to them. The IEP was thereafter sent to the Ashes on September 15, 1989, along with a notice of their legal rights and a form for providing parental consent to placement. The form for providing parental consent to placement was not returned to the ESD by the Ashes.

The educational goals of the IEP prepared for Christopher in 1989 were de-

signed, in general, to improve his communication skills; to teach him to follow directions, to recognize his name, to count to ten, to maintain a low level of self-stimulating behavior such as screaming; to get him to interact with his peers; to get him to maintain the visual attention span necessary to complete tasks; and to increase his physical fitness and ability to play.

These educational goals were to be met by placing Christopher in a self-contained classroom in a public school administered by the ESD. In a self-contained classroom in a public school, the students receive instruction in small groups or individually from the teacher and the aides who provide related services. There are approximately eight to twelve students with one teacher and two aides. Under the IEP, Christopher was to join regular students at lunches, recesses, assemblies, and other special school activities.

On October 10, 1989, Highhouse advised the Ashes that the LOSD was prepared to implement the IEP. The Ashes declined to place Christopher in a public school in the LOSD. However, they asked for a due process hearing seeking reimbursement from the LOSD for the tuition and room and board that they had paid on behalf of Christopher from September, 1985 until January, 1990, as well as other expenses related to his education.

A due process hearing was held from January 30, 1990 until February 2, 1990. Thirteen witnesses testified, and numerous exhibits were received. The record of that hearing is before this court. The witnesses included fact and expert witnesses on behalf of the Ashes and on behalf of the LOSD. Both sides were represented by counsel.

At the due process hearing, the LOSD presented witnesses who had evaluated Christopher and who had developed an IEP for him in 1989. These witnesses described the curriculum that would be offered to Christopher through the LOSD. They testified that the curriculum includes the teaching of skills compatible with the skills that children of Christopher's age have. These witnesses testified as to their evaluation of Christopher and the services that could be provided to him in the self-contained classroom environment in the LOSD.

Devon Welch–Holmes, an instructional consultant with the ESD, and Julie Dunn, a speech and language therapist for the ESD, testified that residential placement is acceptable for an autistic child under very limited circumstances—and then only if the child is a danger to himself.

At the due process hearing, the LOSD presented the testimony of Gary Mesibov, a nationally recognized expert on the education of autistic children and a professor of psychology at the University of North Carolina, who is the co-director of a program called TEAACH which was established in 1972 to provide services to autistic children and their families. In the opinion of Mesibov, the curriculum for the Clackamas County MR/DD program is a strong curriculum which is consistent with current educational practices. Mesibov has observed two of the classrooms operated by the ESD in the LOSD for a wide range of handicapped children, and he found the curricula in each to be impressive. Mesibov was asked whether these classes were appropriate for teaching autistic children, and he responded:

> Well, I think there's a lot of controversy as to whether that's appropriate or not in the field. I don't think there's general agreement. In terms of my personal opinion, I think the curriculum that's offered and the degree of individualization and the presence of mainstreaming and things like that are more important ingredients than who are the other children in the class, particularly if we can balance that with having non-handicapped children come in. So, as I say, it's hard to identify for me what the prevailing professional practice would be because people do differ in their opinion about that.

Transcript of Hearing, Vol. 1, pp. 221–22.

Mesibov testified that the IEP developed for Christopher in 1989 was appropriate and adequate to meet Christopher's needs; that Christopher can benefit from the education proposed by the LOSD; and that a

residential placement is not necessary for Christopher. When asked under what circumstances, if any, he would recommend a residential placement for an autistic child, Mesibov testified:

> There are some I would. I think there are certain—I think the classroom program the school system offered—if the classroom lacked structure, lacked opportunity, lacked expertise, lacked backup support—I think one important aspect of that decision from my perspective would be what's the alternative. And then I think another thing is the child himself. I think that from the record and what I've seen, Christopher seems to be a child with autism which means he's a very challenging child and a very difficult child but he's not a child who's totally out of control in most situations. And I think what you try to balance is, you know, the family is a wonderful resource and the question is if he can be managed within the family and educated within the school system, then he also has the opportunity of growing up in a family just like other children do, and that's, I think, an important opportunity. He also has an opportunity to grow up in the community where supposedly he will be living as an adult, which means the community is going to learn more about him, he's going to learn about the community, and that's going to increase his advantages. So, I think, you always have to weigh, in my mind, you know, the things that he would have to give up to go away versus the things that he gets from going away and then how difficult he is, and then what the school system has to offer so, you know, it seems like his family has a lot to offer him, that the school program has a lot to offer him, and although he's difficult—you know, there's no such thing as an autistic child who's not difficult—he's not totally unmanageable. I mean, he doesn't walk into a room and destroy everything in it as some autistic people do. You know, he's not the kind of physical danger to his family or other people that other people are, at least from my observation of the record and how he performed in the

evaluation. Those are the considerations that I would take into account. I guess I should also say, you know, since I think the advantages of being with a family are so great and being in the community that he's going to live in as an adult, [residential placement is] a recommendation I make only rarely.

*Id.* at 270–72.

Stanley and Barbara Ash described Christopher's disability; the effects it has had on them and their family; and their decision in 1985 to place Christopher in a residential program. In addition to their own testimony, the Ashes presented the testimony of two administrators at the Boston Higashi School, Dr. Paul Hardy and Robert Fantasia.

Hardy is an expert in neurology, psychiatry and behaviorial neurology and is the President of the Board of Directors and the Executive Director of the Boston Higashi School. Hardy testified that several factors are important in determining whether residential placement is necessary for the education of autistic children; that in addition to controlling the behavioral problems that interfere with the ability of autistic children to learn, it is necessary for an autistic child to have consistency, twenty-four hours a day, seven days a week, in order for skills to be developed and then reinforced; and that Christopher suffers from an anxiety or panic disorder which also necessitates his being placed in a residential setting. Hardy stated that the most important factor in determining whether a residential placement, rather than a day-time educational placement, is necessary for an autistic child is whether the proffered day-time program can satisfactorily address the needs of the child for absolute consistency. In Hardy's opinion, Christopher cannot benefit from home placement with day-time schooling at this time:

> Residential placement is always a complex issue and question. And it needs to be considered in a total evaluation of the child and the family.... [I]t is now clear that there are issues of anxiety disorder in Chris which require that he

have an extremely consistent programming between his day program and his residential program.

Transcript of Hearing, Vol. 2, pp. 368–69.

I think based on the family history ... that Chris very likely has panic disorder and the present IEP [LOSD 1989] does not adequately address that, whereas the Higashi IEP systematically deals with anxiety and helps to reduce that [anxiety] through its consistency, its physical education—those being the most important aspects.

*Id.* at 371.

Robert Fantasia is the Administrator of Special Education at the Boston Higashi School and an expert in the education of autistic and handicapped children. Fantasia testified that Christopher should remain in a residential setting at this time. When asked to review the factors that were important to his determination that Christopher needed to be educated in a residential setting, Fantasia testified:

I think the first one with Chris were behavioral issues and not simply whether the Ashes could manage Christopher at home but whether outside of the day residential part, whether anyone could manage the behaviors and whether, without the continuity and consistency between the day and residential aspect, whether the gains that he had made, would those be maintained, and our feeling was that they would not, they would not be maintained, if he did not have not just 24–hour intervention but seven day a week intervention.

. . . .

I think the intensity of Chris's behaviors, the kinds of behaviors that he was involved in, that they could be both self-injurious and also that they could have the potential to be hurtful such as his biting, hitting [inaudible]. And in addition to that, you know, when I talked about the three aspects, the living skills that he had gained we felt that there was still a potential for him to lose those, not just regression but to lose those, if he

were not over a prolonged period of time in an intense program.

*Id.* at 428–29.

On March 30, 1990, the administrative hearing officer entered a final order allowing the LOSD to implement the IEP it prepared for Christopher in 1989 if Christopher's parents enrolled him in the LOSD, and denying the claim of Stanley and Barbara Ash for reimbursement of expenses relating to their residential educational plan for Christopher.

In her final order, the administrative hearing officer made extensive factual findings and discussed the applicable law. The hearing officer concluded: 1) that the LOSD has the burden of proving that the IEP prepared for Christopher in 1989 is appropriate; 2) that the obligation of the LOSD to serve the educational needs of Christopher first arose in early 1984 when Stanley Ash made a visit to Highhouse to inquire as to whether Christopher could attend public school with his tutor; 3) that the IEP prepared for Christopher in 1989 is appropriate and that it need not have prescribed residential placement; and 4) that Stanley and Barbara Ash are not entitled to reimbursement for the years Christopher has spent at the Tokyo and the Boston Higashi Schools.

The administrative hearing officer adopted the opinions of Gary Mesibov that "the classroom teaching methods in the ESD autistic program reflect current best education practices; and that the LOSD IEP for [Christopher] was appropriate." Final Order, p. 24. Based on the opinion of Gary Mesibov, the administrative hearing officer concluded that the LOSD had presented a prima facie showing that the IEP prepared for Christopher by the LOSD was appropriate, and that Stanley and Barbara Ash had failed to refute that showing and had failed to support their contention that Christopher required residential placement. The hearing officer stated:

In most cases residential placement is not required for an autistic child unless the child is a danger to himself or others—not as a result of cognitive immaturity (*e.g.* failing to recognize danger and

stepping off the curb on a busy street), but as a result of violent, self-destructive or assaultive behavior (e.g. gouging at his or her own eyes). [Christopher] was not a danger to himself or others in this sense.

The evidence shows that residential placement for [Christopher] may well be necessary to maintain harmony in his family. But [Christopher] does not require residential placement in order to gain meaningful benefit from his education. By sending [Christopher] out of his community to a residential school LOSD would violate the federal mandate to educate him in the least restrictive environment where he can receive a [free appropriate public education]. LOSD's proposal to educate [Christopher] in a self-contained classroom in a public school near his home, where he will have daily contact with non-handicapped students, is consistent with that mandate.

Final Order, p. 25 (emphasis in original).

The hearing officer also concluded that the IEP prepared for Christopher by the LOSD in 1989 would be better if it included transitional plans and services for Christopher and his parents; counseling and training for his parents; respite services for his parents; and possibly extended day, week and school year services; but that even without these additions, the IEP meets the requirements of the law.

The Ashes thereafter filed this action seeking 1) reimbursement of the educational expenses they have incurred because of the failure or refusal of the LOSD to initiate an evaluation and to prepare an appropriate IEP for Christopher; 2) a declaration approving residential placement for Christopher at the Boston Higashi School and directing the LOSD to reimburse Stanley and Barbara Ash for the costs of the residential placement, along with the incidental fees they have incurred; and 3) an award of the attorney fees, costs, and disbursements incurred in this action.

On April 16, 1991, the court held a hearing at which time supplemental testimony was presented by both parties.

At the hearing, the Ashes offered the expert testimony of Dr. Mary Cerreto, the Director of Psychology at the Franciscan Children's Hospital and Rehabilitation Center in Boston, Massachusetts. Dr. Cerreto is familiar with the Boston Higashi School. She has evaluated Christopher and has reviewed the records and files relevant to this case. Dr. Cerreto is imminently qualified to offer an expert opinion on the issues in this case.

Dr. Cerreto testified that in her opinion Christopher needs a twenty-four-hour-a-day, seven-day-a-week educational program:

> Chris's greatest educational need right now is for an environment that will do ... two things: one, concentrate on the process of Chris's learning; and second, concentrate on the content of Chris's learning. What do I mean by that. He needs 24 hours [a day] because he needs a consistent environment. Chris is not going to be the type of child that's going to learn how to brush his teeth in a classroom. He is not going to learn how to buy things in a classroom store. He's not going to learn how to know what a post office is by reading about it in a story. He's not going to know how to go to bed and adjust to the social things you have to do before bed, the self-help things you have to do before going to bed. *Chris needs to be taught in a natural environment because his cognitive abilities are so low he can't generalize from one environment to the next.*
>
> Secondly, he needs a consistent approach across all of those environments. He needs an approach where the person who teaches him how—self-help skills before bed [—] uses exactly the same approach, rewards, teaching methods, observation methods, evaluation methods that the person who does self-help skills when he wakes up in the morning. So two prime reasons [are] that this young man can't generalize from one situation to another. And at this stage he needs to be taught in each of those, the natural environment. The consistency is a second major reason for his evaluation.

Third is that the things he needs to learn range the entire 24–hour day. He has for example in the past learned to become toilet trained. That was part of a school curriculum. Education for Chris is the ability to be successful outside certainly the classroom and that has incorporated a lot more things than just traditional academics. And so these are the things that a 24–hour a day setup in education can provide him.

Transcript of Testimony of Mary Cerreto and Gary Mesibov, pp. 23–24 (emphasis added).

Dr. Cerreto testified that Higashi is an "appropriate placement for Chris[topher]:"

It provides a 24–hour–a–day seven-day-a-week around the clock, one. Two, it provides education five-and-a-half days a week, and we know with children with autism that the amount of ... instructional time is highly correlated with how they do so they provide a lot of education. They have a very good understanding of where Chris is. They understand how he—if he is operating understanding his world at four years [—] how they should teach him communication, how they should teach him self-help skills, how they should teach him exercise and at following directions, how to base an educational program. They're highly, highly adapted at developmental knowledge. Teachers have a great deal of skill and development as well as education.

*Id.* at 25–26.

Dr. Cerreto agreed that a residential care program is not necessary for all autistic children:

[C]hildren with autism, like children without autism, vary a great deal. They vary depending on their level of cognitive ability of understanding of the world, language abilities, communication abilities and behavior. And I think one of the greatest things that has happened to us during the last decades is that we now have successful autism. We have persons who are autistic who are in integrated classrooms, who are in competitive work sites, who are certainly living in the community, and we never had successful autism before.

*Id.* at 35.

However, in Dr. Cerreto's opinion, based upon her evaluation and diagnosis of Christopher, residential placement is necessary in order for Christopher to receive the basic floor of a free and appropriate education:

[F]or this period of time and next year, two years perhaps, he needs to be taught in natural environments. He cannot generalize from one environment to another. He needs multiple teaching[;] he needs communication and language taught. In the morning when he gets up he needs it[;] when he gets off the bus[;] he needs a communication focus when he's in art class. He needs a communication focus when he's in gym class. He needs communication focus when he's playing at home. He needs self-help skills taught in all those settings. He needs eating skills taught at breakfast, lunch and dinner.

The major argument that I make when I'm looking at residential placement is how the child needs to be taught in order to generalize the situation or in order to be successful in enough situations so you can begin removing those and he knows he has a consistent way of eating. He eats that way no matter where he is. So my no. 1 is that Chris can't learn in different situations with different cues.

Two, its the consistency of the approach. Specific to Higashi we have the same teachers who are working with him from 9 o'clock in the morning till 4 o'clock in the afternoon when he's in school, also teaching him the skill behaviors in the natural environment. Coats and where to put things and games and how to interact with peers and how to go to the store, those kind of things. Those are two of the major things that—reasons why I look at a residential placement.

*Id.* at 36–37.

At the hearing, Mesibov testified that he had visited the Boston Higashi School and had evaluated Christopher at the school,

and that this visit reinforced his conclusion that the IEP prepared for Christopher by the LOSD is a reasonable one. Mesibov explained why he believed that Christopher would receive an appropriate education in the LOSD:

> I think one of the—one of the questions we all agree on and everybody who's been here agrees on is that there's a very small percentage of children who need residential care. I think what we don't always agree on is how do we identify those children and how do we know who they are.
>
> In my particular case, as I say, when you have a child with autism they need two things and they're somewhat incompatible. They need a tremendous amount of consistency and ... the flexibility to live in our society which is changing every minute. So, as I say, in some levels those two things are incompatible.
>
> And what we try to do in different ways, may be emphasizing the consistency when they're younger and the transition and the changes as they enter school, is we try to integrate both into an educational program. Well, there are certain children in my opinion who need so much consistency that they cannot function. You know, we use the term, not a very professional term, but "out of control". They're out of control if the least thing in their environment changes and isn't there.
>
> And very often [this] is manifest through aggressive behaviors and disruptive behaviors and behaviors that are dangerous to themselves and others. Sometimes there are other manifestations. But basically if there's the least little change in their environment then they—it's not only that they're upset and disruptive which all autistic children are [—] they just literally can't function.
>
> So when I look for this one percent or one-half percent who have to have a residential program, that's what I'm looking for. And it was not my opinion that Christopher fell in that one percent, which is not to say that he doesn't need consistency ... which is not to say that

he doesn't have the problems of a person with autism, but that basically at this point I think, and this is what I had thought from the records of my evaluation, was able to corroborate it, that he can handle the kinds of inconsistencies that come from not being in a 24–hour–a–day program.

*Id.* at 80–81.

### STANDARD OF REVIEW

20 U.S.C. § 1415(e)(2) provides that "[i]n any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

■ Review by the court has been described as "something short of a trial *de novo*," being on the record with the opportunity for the parties to supplement the record. *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), *quoting Colin K. By John K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983), *aff'd on other grounds*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). While some addition to the administrative record is allowed, this does not change the character of the hearing from one of review of the record to trial *de novo*. *Id.* at 791. In reviewing the case, the trial court must give specific consideration to the findings of the hearing officer. *Id.*

### APPLICABLE LAW

In order to qualify for federal assistance under the Individuals with Disabilities Education Act, a state must demonstrate that it "has in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1) (Supp.1991). The free appropriate public education must be tailored to meet the needs of the individual child by means of an IEP. 20 U.S.C. § 1401(a)(18).

In *Board of Educ. v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 3047, 73 L.Ed.2d 690 (1982), the Court addressed the issue of

what is meant by the Act's requirement of a "free appropriate public education." The Court concluded:

> Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education.... We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.
>
> . . . .
>
> When the language of the Act and its legislative history are considered together, the requirements imposed by Congress become tolerably clear. Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.

*Id.* at 200–03, 102 S.Ct. at 3048–49.

In addition to providing personalized instruction for a handicapped child, a state must comply with the Act's requirement that this personalized instruction be provided in the least restrictive environment. In order to do so, a state must adopt:

> procedures to assure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary

aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B) (Supp.1991).

Handicapped students are normally enrolled in regular public schools, with the public schools providing the necessary services and making the necessary modifications to their environments and programs in order to ensure the continued enrollment of handicapped students and to ensure educational benefits for them. If, however, a local public school district cannot educate a handicapped child in regular or special classes, the Act authorizes placement in a residential program. 20 U.S.C. § 1413(a)(4)(B). Regulations promulgated under the Act provide: "If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302 (1986).

Courts have concluded that residential placement is necessary to provide a severely autistic child with an appropriate education. *See, e.g., Stacey G. v. Pasadena Indep. School Dist.,* 695 F.2d 949 (5th Cir. 1983); *Drew P. v. Clarke County School Dist.,* 676 F.Supp. 1559 (M.D.Ga.1987). The focus in determining whether residential placement is necessary must be on whether the placement is required for educational purposes apart from the medical, social or emotional problems that are segregable from the learning process. *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 693 (3d Cir.1981); *Vander Malle v. Ambach,* 667 F.Supp. 1015 (S.D.N.Y.1987).

## ANALYSIS

In *Board of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Court held:

> [A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures rea-

sonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. at 206–07, 102 S.Ct. at 3051.

As the court recognized in *Rowley,* the determination of when a handicapped child is receiving those educational benefits required by the Act can be a difficult problem. *Rowley,* 458 U.S. at 201–02, 102 S.Ct. at 3048–49. In every case, the decision is factual and dependent upon the unique problems of the handicapped child.

The issue for this court to decide is whether the Ashes have shown by a preponderance of the evidence that the failure of the IEP prepared by the LOSD to provide Christopher with residential placement denies Christopher sufficient access to a free, appropriate public education through which Christopher can derive some educational benefit.

This court finds the opinion of Dr. Mary Cerreto that Christopher cannot generalize from one learning environment to another—that is, Christopher cannot learn something at school and then take that learning home or into the community—to be compelling. Dr. Cerreto's conclusion is consistent with all of the evidence in the record as to Christopher's severe disability. Christopher has a severe anxiety or panic disorder which cannot be addressed effectively in a classroom setting. In order for Christopher to benefit from a learning environment, the environment in which learning takes place must be a twenty-four-hour-a-day, seven-day-a-week, completely consistent environment.

An appropriate education for Christopher is an education which will make it possible for him to be successful outside of a classroom setting. The evidence in this case shows that an appropriate education for Christopher is one that only a twenty-four-hour-a-day, seven-day-a-week educational environment can provide. While residential placement for a handicapped child is only appropriate in very limited circumstances, Christopher's medical, social and emotional problems are so severe that they are not segregable from his learning process, and therefore residential placement is required for educational purposes. Daily living skills, such as toileting and eating and dressing, can only be taught to him and reinforced for him in the consistency of a residential setting.

Dr. Cerreto's opinion is bolstered by the evidence in the record that the placement of Christopher in the Higashi School is an appropriate placement for him. His severe behavioral problems have improved, and he has received significant educational benefits from that placement.

The hearing officer was without the opinion of Dr. Cerreto and reasonably concluded that the testimony of the Higashi staff was not adequate to outweigh the expert opinion submitted by the LOSD that its IEP was adequate for Christopher. This court has had the benefit of weighing the independent expert testimony presented by both parties and finds that the LOSD has not demonstrated that its IEP would provide the type and amount of consistency necessary in order for Christopher to obtain some educational benefit from its implementation. After a review of the record and the evidence presented to this court, the court is convinced that, at this point in time, Christopher must receive educational services in a residential setting if he is to obtain an appropriate education under the Act.

■ Having concluded that the Ashes have carried their burden to prove by a preponderance of the evidence that, contrary to the proposed IEP prepared by the LOSD in 1989, Christopher was in need of residential placement, this court must determine the relief that is appropriate. 20 U.S.C. § 1415(e)(2).

The Supreme Court has held that the Act authorizes a court to reimburse parties for special education if the court ultimately determines that such placement, rather than the proposed IEP, is proper under the Act. *School Comm. of Burlington v. Department of Educ.,* 471 U.S. 359, 367–69, 105 S.Ct. 1996, 2001–02, 85 L.Ed.2d 385

(1985). Since this court has concluded that it was appropriate to place Christopher in a residential facility contrary to the IEP prepared by the LOSD in 1989, the court has the authority to order reimbursement to his parents who have incurred the costs.

This court agrees with the reasoning of the court in *Wexler v. Westfield Bd. of Educ.*, 784 F.2d 176, 184 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986):

> The EAHCA provides a comprehensive scheme for furnishing a free appropriate public education to handicapped children, and commits to medical and educational professionals employed by the state the responsibility for setting forth an individualized program for each child. In addition, the EAHCA sets forth procedures whereby parents may monitor the state and local determinations and protest them if they think the determinations are erroneous. Indeed, the EAHCA allows parents who disagree with their child's placement to place the child elsewhere and receive reimbursement in the event that the proposed placement was inappropriate. *See Burlington School Committee v. Dept. of Education*, [471] U.S. [359], 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). However, that right to reimbursement exists only when the proposed placement was indeed inappropriate as measured by the standards set forth by the EAHCA and accompanying state and federal regulations.

In this case, the Ashes did not make meaningful contact with the LOSD to seek services for which Christopher was eligible until January 18, 1989. Prior to January 18, 1989, the Ashes made a unilateral decision to enroll Christopher in the private school of their choice, located out of the country initially and subsequently out of state, before the school district had the opportunity to assess Christopher's educational needs and make a placement recommendation. There was no disagreement between the LOSD and the Ashes prior to the decision of the Ashes in 1985 to place Christopher in the Tokyo Higashi School. A disagreement is an essential element in the right to reimbursement under the Act.

*See also Hunter v. Seattle School Dist. No. 1*, 46 Wash.App. 523, 731 P.2d 19 (1987).

This court has not ignored the fact that in April, 1984, Stanley Ash contacted Highhouse to inquire about sending Christopher to a school in the LOSD with a tutor. However, this brief contact with the LOSD does not change the nature of the decision of the Ashes in September, 1985 to send Christopher to the Tokyo Higashi School from a unilateral decision by them to a decision necessitated by a disagreement with the LOSD. Nor does this court find that the LOSD failed to comply with the procedures set forth in the Act in a material manner that affects the outcome in this case.

In January, 1989, the Ashes contacted the LOSD, and the process of evaluating Christopher began. The process of evaluating Christopher was not completed until September, 1989 because Christopher was in school in Boston. After the IEP prepared by the LOSD was completed in September, 1989, the Ashes chose to send Christopher back to the Boston Higashi School and to pursue their disagreement with the LOSD over Christopher's need for residential care through the courts. This was the point in time when the Ashes' right to reimbursement arose for the expenses that they incurred in providing the residential care necessary for Christopher to receive an appropriate education. At this point in time, the LOSD had been asked to provide services to Christopher and had been given a reasonable opportunity to complete the process of evaluating Christopher and making a placement recommendation.

## CONCLUSION

The court finds that the Ashes have carried their burden of proving by a preponderance of the evidence that contrary to the IEP prepared by the LOSD in 1989, Christopher was in need of residential placement. The court finds that the Ashes' right to reimbursement for the costs incurred by them in providing Christopher

with a residential placement arose in September, 1989 when the school district had been asked to provide educational services to Christopher and had been given a reasonable opportunity to complete the process of evaluating Christopher and making a placement recommendation for him.

The court finds that the decision of the Ashes to place Christopher in the Boston Higashi School in September, 1989 was proper under the Act. Given the unwillingness of the LOSD to provide a residential placement for Christopher at the time the IEP was completed in 1989, the court finds that the Ashes should receive reimbursement for the costs incurred in providing schooling for Christopher in the residential setting of the Boston Higashi School after September, 1989. The parties must submit supplemental memoranda addressing the issue of the specific amount of reimbursement appropriate unless they can reach an agreement on the amount of reimbursement.

The court understands the burden that this decision places upon the LOSD and emphasizes, as the court emphasized in the *Drew* case, "that this decision is limited to the unique situation involving a severely autistic child suffering from severe mental retardation." 676 F.Supp. at 1570. It is not the role of this court to rewrite the IEP for Christopher. The parties must attempt to reach a mutually acceptable arrangement that will provide a residential placement for Christopher at a reasonable cost to the LOSD.

The foregoing opinion constitutes findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).