**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES N. VAN DUYN, for his son,
Christopher J. Van Duyn, a minor
& incapacitated person,
            *Plaintiff-Appellant,*

v.

BAKER SCHOOL DISTRICT 5J,
            *Defendant-Appellee.*

No. 05-35181

D.C. No.
CV-02-01060-MO

AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
November 14, 2006—Portland, Oregon

Filed April 3, 2007
Amended September 6, 2007

Before: Warren J. Ferguson, Diarmuid F. O'Scannlain and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Ferguson

11761

## COUNSEL

Pamela C. Van Duyn (argued), Baker City, Oregon, and Damien R. Yervasi, Baker City, Oregon, for the plaintiff-appellant.

Richard Cohn-Lee (argued) and Nancy J. Hungerford, The Hungerford Law Firm, Oregon City, Oregon, for the defendant-appellee.

Lewis Bossing, The Legal Aid Society of San Francisco, San Francisco, California, for the amici curiae The Legal Aid Society of San Francisco - Employment Law Center, the Learning Rights Law Center, the Oregon Advocacy Center and Protection & Advocacy, Inc.

The opinion filed at 481 F.3d 770 (9th Cir. 2007), is amended in full as follows:

## OPINION

FISHER, Circuit Judge:

This case arises from the difficult transition of Christopher J. Van Duyn ("Van Duyn"), a severely autistic child, from elementary to middle school. Van Duyn alleges that Baker School District 5J ("District") failed to implement key portions of his individualized educational program ("IEP") during the 2001-02 school year, his first year at Baker Middle School, thereby depriving him of the free appropriate public education guaranteed by the federal Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*[1] An administrative law judge ("ALJ") ruled that the District failed to provide Van Duyn sufficient math instruction, but otherwise found that the District had adequately implemented the IEP. The district court affirmed the ALJ's decision in all respects and declined to award any attorney's fees to Van Duyn.

Van Duyn brings to us a detailed list of complaints about the District's variances from his IEP, arguing that the ALJ and district court were much too forgiving of the District's failures to provide him the special instructional and support services agreed to in the IEP. Accordingly, we must decide how much leeway a school district has in implementing an IEP as it translates the plan's provisions into action at school and in the classroom. We hold that when a school district does not perform exactly as called for by the IEP, the district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP. A material failure occurs

---

[1]Unless otherwise indicated, all statutory citations are to the IDEA.

when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP.

Applying this standard to the various implementation failures Van Duyn alleges, we conclude that none of them was material (with the exception of the math instruction shortfall, which was later remedied in response to the ALJ's order), and that the District therefore did not violate the IDEA. Because Van Duyn did partially prevail, however, we hold that Van Duyn is to that extent entitled to reasonable attorney's fees for the relevant work done at the administrative hearing level — though not for Van Duyn's mother, who has acted as one of his attorneys in these proceedings. Accordingly, we affirm in part and reverse in part the district court's judgment and remand for further proceedings consistent with this opinion.

## I.   Factual and Procedural Background

### A.   Factual History

Van Duyn is a severely autistic boy who was 13 years old during the 2001-02 school year. During the three years prior to 2001-02, Van Duyn was a student at South Baker Elementary School, where he received extensive special education services. On February 22, 2001, a team comprised of teachers, district representatives and Van Duyn's mother finalized a comprehensive IEP for the 2001-02 school year, during which Van Duyn would transition to Baker Middle School.

Van Duyn's 2001-02 IEP called for him to work on "language arts - reading and written work" for 6-7 hours per week, "math computation/math computer drills" for 8-10 hours per week and "adaptive P.E. - gymnastics and swimming" for 3-4 hours per week. At the middle school, his schedule consisted of alternating "red" and "white" days, with gym, language arts/reading, math and study skills on red days, and social studies/language arts, computers/vocational, lan-

guage arts and reading on white days. Classes each lasted for about 80 minutes, and he worked on math skills during his designated red day math classes as well as during his advisory time and study skills and computers/vocational classes. Van Duyn attended gym class, which included a two-week gymnastics segment, on red days, and had swimming lessons twice per week.

Van Duyn's IEP also included a behavior management plan that was to be implemented full-time. Like the elementary school that he had previously attended, the middle school employed a daily behavior card, a visual schedule, social stories and a quiet room. However, his behavior was not accurately recorded on the card, he did not set up his daily schedule before starting each school day, social stories were not properly used and he was not ordered to go to the quiet room after all incidents of misbehavior.

The IEP further called for all material to be presented at Van Duyn's level and for him to be placed in a "self-contained" special education room. During class, he typically received one-on-one instruction from his personal aide, Linda Baxter, as well as some personal instruction from his two main teachers, Sue Irby and Kathleen Walker. It is unclear whether he generally proceeded at his own pace or instead received instruction about whatever subject the class was studying that day. His classes varied in size from 7 to 15 students and were composed entirely of special education students.

Other provisions in the IEP required the regional autism specialist to visit the middle school twice per week, "augmentative communication" services to be provided for two hours per month and Van Duyn's aide, Ms. Baxter, to receive state autism training. The regional autism consultant visited the middle school a dozen times over the first three months of the 2001-02 school year, and other autism consultants also came by with some regularity. Augmentative communication ser-

vices were provided to Van Duyn in the form of visual aids, social stories, creative computer programs and other learning tools, though not by regional staff. His aide, Ms. Baxter, did not receive state-level training in educating autistic children, but she did attend local autism classes and meet with individuals who had worked with him in the past.

Finally, under the IEP, Van Duyn's progress was to be measured by quarterly report cards, and approximately 70 short-term objectives corresponding to a series of annual goals were to be pursued. The middle school issued quarterly report cards to Van Duyn containing percentage scores in a range of categories. Some of these categories corresponded to the IEP goals while others did not, and on the whole the middle school report cards did not track the IEP as well as the elementary school report cards did. Van Duyn also worked toward many but not all of the short-term objectives set out in the IEP. For example, he did not participate in any telephone activities or write a daily note home until December 2001.

There is evidence that Van Duyn's reading skills deteriorated during the 2001-02 school year, though it is unclear whether the regression amounted to three years or less than one. However, the school's therapist and psychologist both testified that his behavior improved in 2001-02 and that he was more engaged with his surroundings as the year progressed. Ms. Walker also testified that Van Duyn's math skills showed progress in 2001-02. Finally, his report cards indicated improvement in the vast majority of categories from October 2001 to June 2002.

## B.   Procedural History

On September 25, 2001, a few weeks after the 2001-02 school year had begun, Van Duyn's parents filed a request for a due process hearing pursuant to 20 U.S.C. § 1415(f). They alleged that the District had completely failed to provide cer-

tain services described in the IEP and materially failed to implement other IEP provisions. According to his parents, these failures were depriving Van Duyn of a free appropriate public education. The ALJ issued a detailed decision on April 8, 2002. She found that the District had failed to implement the IEP with regard to Van Duyn's math goals because he was not being given the requisite 8-10 hours of weekly math instruction. Accordingly, the ALJ ordered the District to provide Van Duyn with the "average of five hours per week of instruction in math that he has not been receiving." In every other contested area, the ALJ ruled in favor of the District. She found that Van Duyn's aide and teachers had been properly trained, that he had been placed in a self-contained classroom, that his teachers had worked with him on oral language skills, that he had received daily instruction in reading and that short-term objectives such as taking a daily note home had not initially been implemented but were now being followed.

Van Duyn appealed the ALJ's decision to the district court. The court first ruled that only events prior to February 1, 2002 (the date of the administrative hearing) could be used to determine whether the District failed to implement the IEP, though later events could be considered in crafting a remedy. The court then divided Van Duyn's allegations of failed implementation into several categories, affording the ALJ's comprehensive findings considerable deference. The court concluded that there had been no failure to implement a substantial provision of the IEP. The court also ruled that the District had complied with the ALJ's order that additional math instruction be provided to Van Duyn, and that Van Duyn was not entitled to attorney's fees because he was not the prevailing party.

Van Duyn timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II.    Standard of Review

We review the district court's findings of fact for clear error, even when they are based on the written record of administrative proceedings. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). The district court's legal conclusions are reviewed de novo. *Id.* However, "complete de novo review" of the *administrative* proceeding "is inappropriate." *Id.* Under the IDEA, federal courts are to "receive the records of the administrative proceedings" and "bas[e their] decisions[s] on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C). This means that "due weight" must be given to the administrative decision below and that courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Henrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 206 (1982) ("*Rowley*"); *see also Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) ("The amount of deference accorded the hearing officer's findings increases where they are thorough and careful.") (internal quotations and citation omitted).

## III.    Discussion

### A.    Legal Background

[1] The IDEA was enacted in 1975 because of Congress' belief that "the educational needs of millions of children with disabilities were not being fully met." 20 U.S.C. § 1400(c)(2). The statute's stated purposes include "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs and prepare them for further educational, employment, and independent living," and "to ensure that the rights of children with disabilities and parents of such children are protected." § 1400(d)(1)(A), (B). According to Senator Harrison Williams, the IDEA's principal drafter, "[t]his measure fulfills the

promise of the Constitution that . . . handicapped children no longer will be left out." 121 Cong. Rec. 37,413 (1975).

One of the IDEA's most important mechanisms for achieving these lofty goals is the formulation and implementation of IEPs. Under § 1414(d), every disabled child must have an IEP drafted and put into effect by the local educational authority. The IEP is to be formulated by a team that includes the child's parents, regular and special education teachers, a district representative and other individuals with relevant expertise. § 1414(d)(1)(B). It must address such matters as the child's present level of academic achievement, annual goals for the child, how progress toward those goals is to be measured and the services to be provided to the child. § 1414(d)(1)(A)(i). The child's parents are entitled to participate in meetings regarding the IEP, § 1415(b)(1), and must receive written notice of any proposed changes to the IEP, § 1415(b)(3). Either the child's parents or the local educational authority may bring a complaint to the state educational agency about any matter relating to the IEP or the child's free appropriate public education. § 1415(b)(6), (7). If such a complaint is not otherwise resolved, a due process hearing is held to determine "whether the child received a free appropriate public education." § 1415(f)(3)(E)(i). After going through the due process hearing and any other available administrative remedies, an aggrieved party may file a civil action in federal district court. § 1415(i)(2)(A).

The Supreme Court's first and most significant opinion interpreting the IDEA was its 1982 decision in *Rowley*, in which the Court considered the content of an IEP that was allegedly deficient because it did not call for a sign-language interpreter to assist the deaf child in all of her classes. The Court rejected this challenge, concluding that all of the IDEA's procedural requirements had been followed and that the statute did not aim "to *maximize* the potential of each handicapped child" but rather merely "to provide them with access to a free public education." 458 U.S. at 200 (emphasis

added). The Court also set out a two-part test for evaluating complaints about the *content* of an IEP: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206-07 (internal footnotes omitted).

We have applied the *Rowley* framework in numerous cases. *See, e.g.*, *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 644-46 (9th Cir. 2005); *Amanda J.*, 267 F.3d at 890-95; *Wartenberg*, 59 F.3d at 891-97. However, we have not previously considered challenges to the implementation — as opposed to the content — of an IEP. As discussed in more detail below, the Fifth Circuit addressed IEP implementation challenges in *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000), holding that de minimis failures to implement an IEP do not amount to a violation of the IDEA, but rather that the statute is violated only by failures to implement "substantial" or "significant" IEP provisions. *Id.* at 349. The Eighth Circuit took a similar position in *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003), holding that the IDEA is violated when a school fails to implement an "essential" element of an IEP, i.e., an element "necessary for the child to receive an educational benefit." *Id.* at 1027 n.3.

## B.  Violations of the IDEA's Procedural Requirements

Against this background, we turn to Van Duyn's argument that the District's alleged failures to implement his IEP amounted to both a violation of the IDEA's procedural requirements and a substantive violation that denied him a free appropriate public education. We conclude there were neither procedural nor substantive violations of the statute.

Van Duyn's first contention is that by failing to implement portions of the IEP, the District "changed" the IEP without notifying his parents in advance — a violation of the IDEA's

procedural requirements for the formulation and revision of IEPs. *See* § 1415(b)(3). In his view, this procedural defect impeded his parents' right to participate in decisions regarding the IEP and hence violated the statute even if he cannot directly establish that he was deprived of educational benefits or a free appropriate public education. *See* § 1415(f)(3)(E)(ii)(II) (IDEA violated if procedural flaws "significantly impede[ ] the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child").

**[2]** Van Duyn's procedural argument fails because there is no evidence in the record that the District ever attempted to change his IEP after the 2001-02 school year began. He points to no concrete proposals to change the IEP, nor is there any testimony or documentary evidence that the District decided to revise the IEP in secret. The District did request a "[m]eeting to discuss Augmentative Communication and Autism Service Time" in May 2001. But Van Duyn's parents were notified about the meeting, it took place well before the 2001-02 school year started and it resulted in no change to the IEP because the IEP team decided that "[t]ransitioning to a new school and teachers is a major change for an Autistic student and more services are needed."

**[3]** Van Duyn's procedural argument thus boils down to the novel proposition that failures to *implement* an IEP are equivalent to *changes* to an IEP. If accepted, this proposition would convert all IEP implementation failures into procedural violations of the IDEA, but there is no indication that a conflation of this sort is intended or permitted by the statute. Moreover, the one case that Van Duyn cites as support, an unpublished Maryland district court decision, is unhelpful to him. *Manalansan v. Board of Educ. of Baltimore City*, No. Civ. AMD 01-312, 2001 WL 939699 (D. Md. Aug. 14, 2001) (unpublished), held that the Baltimore educational authority violated the IDEA because of substantive failures in implementing an IEP — not because of any procedural shortcomings in the

IEP's formulation or implementation. *See* 2001 WL 939699, at *15 (free appropriate public education denied because "the only rational determination . . . is that defendants have failed to implement Brandon's IEP"). Like all other courts to have considered the relationship between IEP implementation failures and IDEA procedural violations, *Manalansan* understood the tardiness and absences of the plaintiff's aides as failures to implement the IEP, not surreptitious attempts to alter it.

## C.   Failures To Implement the IEP

We therefore turn to Van Duyn's principal contention — that the District in fact failed to implement portions of his IEP. In addressing his argument, we hold that the ALJ did not erroneously allocate the burden of proof at the administrative hearing, that state contract law does not apply to the interpretation of an IEP and that only material failures to implement an IEP constitute violations of the IDEA. Applying this standard, we conclude that none of the implementation failures that Van Duyn alleges was material.

### 1.   Burden of Proof

[4] Van Duyn argues that the ALJ erroneously placed the burden of proof on him to establish that the District failed to implement the IEP. Although the ALJ never specified which party bore the burden, even if she did place the burden on Van Duyn, doing so was proper under *Schaffer v. Weast*, 546 U.S. 49 (2005). The Supreme Court held in *Schaffer* that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Id.* at 537. Van Duyn, as the party objecting to the IEP's implementation, thus bore the burden of proof at the administrative hearing.

[5] Van Duyn contends that *Schaffer* is inapplicable because it dealt with a challenge to the content rather than the implementation of an IEP, but that is a distinction without a

difference. Nothing in *Schaffer* hinged on the kind of challenge being made to the IEP. Rather, the Court cited "the ordinary default rule that plaintiffs bear the risk of failing to prove their claims," holding that "[a]bsent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." *Id.* at 535; *see also Stringer v. St. James R-1 Sch. Dist.*, 446 F.3d 799, 803 (8th Cir. 2006) (following *Schaffer* in context of claim that IEP was not being implemented). Neither *Schaffer* nor the text of the IDEA supports imposing a different burden in IEP implementation cases than in formulation cases. Accordingly, we hold that if the ALJ placed the burden of proof on Van Duyn, that allocation was correct.[2]

## 2. Interpretation of the IEP

[6] Van Duyn next argues that contested terms in the IEP should be interpreted under Oregon contract law, in particular the principle that ambiguities must be resolved in Van Duyn's favor because the document was drafted by the District for his benefit. This argument, raised for the first time on appeal, is meritless. First, the IEP is entirely a federal statutory creation, and courts have rejected efforts to frame challenges to IEPs as breach-of-contract claims. *See, e.g.*, *Ms. K. v. City of South Portland*, 407 F. Supp. 2d 290, 301 (D. Me. 2006) ("[A]n IEP is not a legally binding contract."). Van Duyn offers no example of a court treating an IEP as a contract, nor have we been able to locate any.

---

[2]There is language that appears to impose the burden on the school district in *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1398 (9th Cir. 1994). But that language is in direct conflict with the Court's subsequent decision in *Schaffer*, and is also mere dictum since only the burden of proof at the district court (as opposed to administrative) level was at issue in *Clyde K. See also B.B. ex rel. J.B. v. Hawaii Dep't of Educ.*, 2006 WL 3002235, *6 (D. Haw. Oct. 19, 2006) (noting that "the law [has] changed" since *Clyde K.* as a result of the Court's decision in *Schaffer*).

**[7]** Second, even if the principle that ambiguous terms are interpreted against the drafting party applied, it would not help Van Duyn. His parents played a central role in the drafting of the IEP, so it is unclear who the IEP's "author" is for contract law purposes. In addition, the terms Van Duyn cites as ambiguous simply do not mean what he claims, even taking the favorable contract law principle into account. In our view, Van Duyn's real objection is not to the ambiguity of the IEP's terms but rather to its omission of additional requirements for the District. This is not a problem we can solve. An IEP is not a contract — but even if it were, we could not read into it additional terms the parties did not agree to include.

### 3.   The Materiality Standard

**[8]** The core of Van Duyn's case is his allegation that the District failed to implement his IEP. Because most IDEA cases involve the formulation rather than the implementation of an IEP, our court has not yet articulated the standard for assessing an IEP's implementation. To determine this standard, we look to both the statutory text and decisions of other courts.

**[9]** The IDEA defines a free appropriate public education as "special education and related services that . . . are provided in conformity with the [child's] individualized education program." § 1401(9). The statute also allows a party to challenge an IEP because of procedural flaws in the IEP's formulation as well as "on substantive grounds based on a determination of whether the child received a free appropriate public education." § 1415(f)(3)(E)(i). This language surely indicates that a failure to implement an IEP may deny a child a free appropriate public education and thereby give rise to a claim under the statute. The language also counsels against making minor implementation failures actionable given that "special education and related services" need only be provided *"in conformity with"* the IEP. There is no statutory requirement of perfect adherence to the IEP, nor any reason

rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education.

**[10]** As noted earlier, the Supreme Court in *Rowley* was faced with a challenge to an IEP's content. Nevertheless, the Court's approach is instructive in the IEP implementation context as well. In particular, it is significant that, according to the Court, procedural flaws in an IEP's formulation do not automatically violate the IDEA, but rather do so only when the resulting IEP is not "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 207. This suggests that minor failures in implementing an IEP, just like minor failures in following the IDEA's procedural requirements, should not automatically be treated as violations of the statute. The Court's description of the IDEA's purpose as providing a "basic floor of opportunity" to disabled students rather than a "potential-maximizing education" also supports granting some flexibility to school districts charged with implementing IEPs. *Id.* at 197 n.21, 201.

The two circuits to have explicitly addressed IEP implementation failures both did so in a manner consistent with our reading of the statutory text and *Rowley*. In *Bobby R.*, the Fifth Circuit considered a disabled child whose IEP had not been perfectly implemented and whose academic performance had improved in some areas and declined in others. The court held that "to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." 200 F.3d at 349. Employing this standard, the court concluded that conceded implementation failures did not violate the IDEA because "the significant provisions of [the child's] IEP were followed, and, as a result, he received an educational benefit." *Id.*[3]

---

[3]The implementation failures in *Bobby R.* included not providing the one hour a week of speech therapy required by the IEP for part of the

Similarly, the Eighth Circuit held in *Clark* that the IDEA is violated "if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit." 315 F.3d at 1027 n.3. To determine if the "fact that no cohesive plan was in place to meet [the child's] behavioral needs" gave rise to a statutory violation, the court considered both the shortfall in services provided and evidence regarding the child's progress in several areas. *Id.* at 1029. The court concluded that the IDEA was indeed violated because the actions taken by the school "did not appropriately address [the child's] behavior problem," *id.* at 1028, and "any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with [the child's] ability to obtain a benefit from his education." *Id.*

[11] In accordance with the IDEA itself, the Court's decision in *Rowley* and the decisions of our sister circuits, we hold that a *material* failure to implement an IEP violates the IDEA. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP. Because the parties debate whether Van Duyn's skills and behavior

---

1994-95 academic year and not offering a special speech program during the first two months of the 1996-97 academic year. *See id.* at 344, 348. The school sought to compensate for these shortcomings by providing 25 hours of speech therapy during the summer of 1995 and offering supplemental services in 1996-97 (which were rejected by the parents). *See id.*

Bobby R. went on to consider whether the child had benefitted from the IEP, holding that, despite some contrary testimony, "the objective evidence of increased scores and grade levels" showed that the child had received an educational benefit. *Id.* at 350. The court's discussion of educational benefit was responsive to one of four factors that govern in the Fifth Circuit. *See Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247-48 (5th Cir. 1997). We, of course, are not bound to follow the *Cypress-Fairbanks* factors, and we would disagree with *Bobby R.* if it meant to suggest that an educational benefit in one IEP area can offset an implementation failure in another.

improved or deteriorated during the 2001-02 school year, we clarify that the materiality standard does not require that the child suffer demonstrable educational harm in order to prevail. However, the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided. For instance, if the child is not provided the reading instruction called for and there is a shortfall in the child's reading achievement, that would certainly tend to show that the failure to implement the IEP was material. On the other hand, if the child performed at or above the anticipated level, that would tend to show that the shortfall in instruction was not material. We also emphasize that nothing in this opinion weakens schools' obligation to provide services "in conformity with" children's IEPs. § 1401(9). IEPs are clearly binding under the IDEA, and the proper course for a school that wishes to make material changes to an IEP is to reconvene the IEP team pursuant to the statute — not to decide on its own no longer to implement part or all of the IEP. *See* §§ 1414(d)(3)(F), 1415(b)(3).[4]

---

[4]Our dissenting colleague criticizes the standard set forth here as inconsistent with the statutory text, "inappropriate for the judiciary" and "unworkably vague." Dissent at 11788. Although we share the dissent's concerns for the welfare of disabled schoolchildren, we respectfully disagree with its proposed per se rule. First, there is no tension between the IDEA and the materiality standard, because services to a disabled child are still provided "in conformity with" or "in accordance with" the child's IEP if an implementation failure is not material. *See* 20 U.S.C. § 1401(9)(D); 34 C.F.R. § 300.323(c)(2). We do not believe we must interpret the IDEA in such a way that even minor implementation failures automatically violate the statute, nor has any other court done so. Second, although a materiality standard lacks the precision of the dissent's proposed per se rule, determining "materiality" has been a part of judging for centuries — for example, deciding whether a contractual breach is material. *See, e.g.*, American Law Institute, Restatement (Second) of Contracts § 241 (1981) (discussing concept of material breach); *Krebs Hop Co. v. Livesley*, 92 P. 1084, 1086-87 (Or. 1907) (same). For this reason, not even Van Duyn has advocated a per se rule like the dissent's; indeed, at oral argument his counsel agreed that a standard akin to that endorsed in *Bobby R.* would be satisfactory.

### 4.    Implementation of the IEP

Applying the standard for evaluating alleged IEP implementation failures here, we turn to the various areas in which Van Duyn asserts that the District failed to implement his IEP. Because both the ALJ and the district court have already considered at length Van Duyn's alleged implementation failures — and because we largely agree with their analyses — we focus on what we understand to be Van Duyn's weightiest claims: that he did not receive sufficient math instruction, that his behavior management plan was not implemented properly, that work was not presented at his level and that he was not placed in a self-contained classroom.[5]

[12] First, Van Duyn's IEP required 8-10 hours of math instruction per week. The ALJ found that he was not being provided with sufficient instruction and therefore ordered that he receive the "five hours per week of instruction in math that he has not been receiving." We agree that the initial five-hour shortfall was a material implementation failure. Van Duyn

---

[5]On the remaining allegations of implementation failure, our conclusions, briefly, are as follows: Van Duyn did receive daily reading and writing instruction, as required by his IEP, since he had language arts/reading on red days and three relevant classes on white days. He did not work toward all of the short-term objectives laid out in his IEP, but this failure was not material given the extremely large number of such objectives. The IEP did not require augmentative communication services to be provided solely by regional staff, only that Van Duyn be exposed to such services for two hours per month, which he was. The regional autism consultant's failure to visit the school twice-weekly was not material given the frequent visits that she and the other autism consultants made. Van Duyn did take part in gymnastics and swimming for approximately the required amount of time per week. The middle school report cards largely resembled the elementary school report cards used previously and tracked many of the IEP's goals and short-term objectives. And even though she was never trained at the state level, Ms. Baxter did attend autism classes and meet with people knowledgeable about Van Duyn's experience with the condition. Accordingly, the District did not materially fail to implement Van Duyn's IEP in any of these areas.

now claims that only 100 minutes of math instruction per week were added in response to the ALJ's order and that the District was thus still not in compliance with the IEP. However, he makes no effort to rebut the testimony to the contrary by Ms. Walker, who taught three of Van Duyn's eight classes, and Ms. Irby, his other main teacher. Ms. Walker testified that Van Duyn worked on math in two red day classes, one white day class and his "advisory time," and therefore received the requisite math instruction. Similarly, Ms. Irby testified that Van Duyn used math computer programs in her classes for roughly 100 minutes per week. We therefore hold that after the District's corrective actions, there was no material failure to provide Van Duyn with the required amount of weekly math instruction.[6]

Second, Van Duyn is correct that several elements of his behavior management plan were not implemented in the same way at the middle school as at the elementary school. The daily behavior card was not used as strictly as it was before. Social stories were never employed in Ms. Walker's three classes and were improperly used by Ms. Baxter and Ms. Irby. And Van Duyn was not told to go to the "quiet room" after all incidents of misbehavior, nor was the room adequately equipped until just before the administrative hearing.

[13] Although we do not condone these failures to implement the behavior management plan, we conclude that they were not material for several reasons. First, the IEP did not clearly describe how the daily behavior card, social stories and quiet room were used at the elementary school, nor did it require that they be used in the same way at the middle

---

[6]Our conclusion is bolstered by the fact that Van Duyn's math skills appear to have improved in 2001-02. Ms. Walker testified that he made progress toward his measurable annual goal in math and that "[h]e's really good with adding. He's fast. He is, he's like a little machine on some problems." Ms. Walker added that Van Duyn's IEP team was looking to add new, more difficult math goals for the 2002-03 calendar year.

school. It is undisputed that the behavior management plan was not implemented identically at the two schools, but the IEP did not say that it had to be. Second, the middle school did employ many of the techniques outlined in the behavior management plan, even if not quite as Van Duyn envisioned. Third, there is evidence that the elementary school behavior management plan was inappropriate for the middle school context. Van Duyn's former aide testified that "[i]t looks to me like the system that we used at South Baker doesn't work at the middle school, and so it's not being used the same." Finally, Van Duyn's behavior appears to have improved in 2001-02. The school speech therapist stated that while "in the previous [reports] it's mentioned that Chris doesn't notice others in his environment," "[t]he following year we see that Chris does notice others in his environment and is engaging more." The school psychologist added that Van Duyn was being sent to the quiet room only about once per month at the middle school, a much lower rate than at the elementary school.

**[14]** Next, there is some ambiguity in the record about whether, as required by the IEP, work was presented at Van Duyn's level. On the one hand, Ms. Baxter testified that what Van Duyn would learn about on any given day depended on what the class was taught that day. On the other hand, his two main teachers, Ms. Walker and Ms. Irby, testified that he was never subjected to lecture-style teaching and generally received one-on-one instruction. Ms. Walker described "filter-[ing] around to the students" while Ms. Irby stated that Van Duyn's instruction was largely one-on-one with her or the assistant. On this conflicting record, we cannot conclude that the District materially failed to present work at Van Duyn's level. We also note that there is no evidence that his educational progress was hindered as a result of exposure to materials that were too advanced for him.

Finally, the parties dispute the meaning of "self-contained sp[ecial] ed[ucation] room" and whether Van Duyn was pro-

vided with such placement. He contends that his IEP required a learning environment like the one he enjoyed at the elementary school, with a single classroom where highly disabled students receive instruction individually or in small groups and there is complete flexibility as to the timing and content of instruction. *See Ash v. Lake Oswego Sch. Dist. No. 7J*, 766 F. Supp. 852, 856 (D. Or. 1991) (self-contained classroom contains 8-12 students with one teacher and two aides). The District, however, asserts that a self-contained classroom is a "service" rather than a "placement," and exists whenever a student spends more than 60 percent of his time in a special education classroom.

**[15]** Even under Van Duyn's definition, which appears nowhere in the IEP and is at odds with Oregon practice as well as the testimony of one of his own witnesses, we hold that the District did not materially fail to provide him with a self-contained classroom. His class sizes varied from 7 to 15 students (a range with an almost identical midpoint to the 8-12 range cited in *Ash*), and there were always one teacher and one aide present (comparable to the one teacher and two aides in *Ash*). Whereas the student-teacher/aide ratio was somewhat higher in the middle school than in *Ash*, it is significant that Ms. Baxter was Van Duyn's personal full-time aide. There is no indication that the two aides in *Ash* were specifically designated for individual students.

Furthermore, there was substantial flexibility in the instruction that Van Duyn received at the middle school. While he was on a block schedule with set times for classes, he could take breaks whenever they were necessary, he received constant attention from Ms. Baxter and frequent one-on-one instruction from Ms. Walker and Ms. Irby and the projects he worked on were typically unrelated to his classes' nominal subject matter. This may not have been quite as beneficial a learning environment as the elementary school, but we cannot conclude that it constituted a material failure to provide Van Duyn with a self-contained classroom.

**[16]** We therefore hold that the District did not materially fail to implement any provisions in Van Duyn's IEP (with the exception of the math instruction requirement, which we hold was satisfied after the ALJ's order).

## D.   Attorney's Fees

Van Duyn requests two remedies from this court: compensatory education and attorney's fees. No compensatory education is warranted because he has failed to establish any material failure by the District in implementing his IEP. Contrary to the district court, however, we hold that Van Duyn is entitled to reasonable attorney's fees for the administrative hearing to the extent he partially prevailed in that proceeding, but only for counsel other than his attorney-mother.

**[17]** Under the IDEA, "the court, in its discretion, may award reasonable attorney's fees as part of the costs . . . *to a prevailing party* who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i) (emphasis added). A prevailing party is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1498 (9th Cir. 1994) (internal quotation omitted). The success must materially alter the parties' legal relationship, cannot be de minimis and must be causally linked to the litigation brought. *Id.*; *see also Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034-37 (9th Cir. 2006).

Under this standard, Van Duyn was not the prevailing party at the district court level because that court affirmed the ALJ's decision in its entirety and refused to grant him any additional relief. Van Duyn also was not the prevailing party in his challenge to his 2002-03 IEP before the Oregon Department of Education because the Department did not revisit the contested IEP but rather ordered the parties to work together

to formulate a new IEP for the 2003-04 school year. Nor, of course, is he the prevailing party here.

**[18]** We hold, however, that Van Duyn was the prevailing party at the administrative hearing to the extent the ALJ ruled in his favor regarding the amount of math instruction he was due. The amount of math instruction was a "significant issue" in the proceeding, and the remedy the ALJ ordered — an additional five hours of math instruction per week — clearly produced "some of the benefit" that Van Duyn sought. *See Parents of Student W.*, 31 F.3d at 1498. The District is correct that the math instruction issue was only one issue out of 11 raised at the administrative hearing, but there is no reason to view it as less important than Van Duyn's other claims; indeed, it appears weightier than several of them. The relevant point is that he prevailed on the issue's merits and obtained a remedy — the extra weekly math instruction — that materially altered his legal relationship with the District. The District argues that because the ALJ ordered only the provision of services already required by the IEP, there was no change in the parties' existing legal relationship. We reject this argument because the ALJ's order created a legal obligation for the District to provide services that it had not previously been offering. Were the District's argument accepted, it would mean that a plaintiff in an implementation failure suit could win attorney's fees only if he was awarded not only the remedies mandated by his IEP, but also compensatory education (or other relief) not called for by his IEP.

**[19]** The District correctly argues, however, that attorney's fees should not be granted to *parent* attorneys who represent their children in IDEA proceedings. *See Ford v. Long Beach Unified Sch. Dist.*, 461 F.3d 1087, 1090 (9th Cir. 2006) ("Next, we must determine whether the IDEA authorizes attorneys' fees for attorney-parents. We join three other circuits in concluding that it does not."). Accordingly, Van Duyn is entitled to attorney's fees for the administrative hearing, but only for counsel other than his mother. We remand to the dis-

trict court to determine the appropriate sum. On remand, the court has discretion to consider that Van Duyn prevailed on one issue at the administrative hearing but lost on all the others. *See* 20 U.S.C. § 1415(i)(3)(B) ("[T]he court, in its discretion, may award *reasonable* attorney's fees . . . ." ) (emphasis added); *Aguirre v. Los Angeles Unified Sch. Dist.*, 461 F.3d 1114, 1118 (9th Cir. 2006) (" '[T]he level of a[n IDEA] plaintiff's success is relevant to the amount of fees to be awarded.' ") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 430 (1983)).

## IV.    Conclusion

We hold that any failures by the District to implement Van Duyn's IEP did not constitute violations of the IDEA's procedural requirements. We also hold that any such failures were not material. A material failure to implement an IEP occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP. Applying that standard here, the services the District provided were not materially different from what was required by the IEP (again with the exception of the math instruction provided prior to the ALJ's order). Finally, because Van Duyn partially prevailed in the administrative proceeding, he is to that extent entitled to reasonable attorney's fees, but not for his mother's legal services. The parties shall bear their own costs on appeal.

**AFFIRMED IN PART AND REVERSED IN PART; REMANDED.**

---

FERGUSON, Circuit Judge, dissenting:

## I.

The majority involves the judiciary in determining the "materiality" of a school district's failure to implement a student's

Individualized Education Program ("IEP"). This standard is inconsistent with the text of the Individuals with Disabilities Education Act ("IDEA"), inappropriate for the judiciary, and unworkably vague. Given the extensive process and expertise involved in crafting an IEP, the failure to implement *any* portion of the program to which the school has assented is *necessarily* material. Therefore, I respectfully dissent.

## II.

Under the IDEA, once a school district identifies or assesses a student as learning disabled, it must convene an IEP Team to determine the special needs of the child. 20 U.S.C. § 1414. The IEP Team consists of the child, the child's parents, at least one regular education teacher (if mainstream participation is contemplated), at least one special education teacher, a specially qualified representative of the school district, an individual who can interpret the instructional implications of evaluation results, and other individuals with expertise regarding the child's needs and disability. § 1414(d)(1)(B).

Once convened, this IEP Team meets as many times as necessary to draft an IEP for the student. § 1414(d). The IEP is the central document that guides a child's special education. It details the child's present levels of academic achievement, his or her goals, the criteria for measuring progress, and the services and accommodations that the school has committed to providing. § 1414(d)(1)(A)(i). An IEP is the product of an extensive process and represents the reasoned conclusion of the IEP Team that the specific measures it requires are necessary for the student to receive a free appropriate public education ("FAPE"). The school is required to implement the IEP as part of the IDEA's broad, overarching purpose "to ensure that all children with disabilities have available to them a free appropriate public education." § 1400(d)(1)(A).

A school district's failure to comply with the specific measures in an IEP to which it has assented is, by definition, a

denial of FAPE, and, hence, a violation of the IDEA. *See* § 1401(9)(D) ("The term 'free appropriate public education' means special education and related services that . . . are provided *in conformity with* the individualized education program.") (emphasis added); *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 642 (9th Cir. 2005) (quoting statutory definition of FAPE); 34 C.F.R. § 300.323(c)(2) ("Each public agency must ensure that . . . special education and related services are made available to the child *in accordance with the child's IEP*.") (emphasis added).

Judges are not in a position to determine which parts of an agreed-upon IEP are or are not material.[1] The IEP Team, consisting of experts, teachers, parents, and the student, is the entity equipped to determine the needs of a special education student, and the IEP represents this determination. Although judicial review of the content of an IEP is appropriate when the student or the student's parents challenge the sufficiency of the IEP, *see, e.g.*, *M.L.*, 394 F.3d at 642, such review is not appropriate where, as here, all parties have agreed that the content of the IEP provides FAPE. Having so agreed, the school district must "provide[ ] [special education and related services] in conformity with the individualized education program." 20 U.S.C. § 1401(9)(D).

Instead of trying to understand how material a failure is, we must assume that the IEP Team knew what it was doing when it settled on a specific educational service. Each IEP Team chooses specific services with specific quantities and durations for the purpose of providing the student with FAPE. If the IEP Team had thought another, lesser service would be sufficient to provide FAPE, it would have included that service in the IEP.

---

[1]The majority contends that "determining 'materiality' has been a part of judging for centuries." *See* maj op. at 11780 n.4. Curiously, it gives the example of contract law to prove this point. *Id.* Yet only a few pages earlier, it states, in no uncertain terms, that "[a]n IEP is not a contract" and that contract law is irrelevant in cases like this one. *Id.* at 11777.

Of course, if after implementing the IEP, the school district believes that portions of the program are not essential to providing FAPE, it is free to amend the IEP through the required channels, including a reconvening of the IEP Team. § 1415(b)(3). But allowing the school district to disregard already agreed-upon portions of the IEP would essentially give the district license to unilaterally redefine the content of the student's plan by default. Such license undermines the collaborative role of the IEP Team and ignores the parental participation provisions of the IDEA. § 1414(d)(3)(A)(ii), (e).

The majority's standard also suffers from vagueness. It holds that "[a] material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP." It provides little guidance as to what constitutes a minor discrepancy. If an IEP requires ten hours per week of math tutoring, would the provision of only nine hours be "more than a minor discrepancy"? Eight hours? Seven hours? Because most IEPs contain such quantitative requirements for special education services, the majority's standard will provide little guidance in resolving these implementation issues.

## III.

In the present case, no one disputes that the district failed to fully implement the IEP. In particular, the IEP required, *inter alia*, that (1) Christopher's aide and teacher would be trained in autism by the State; (2) Christopher would receive augmentative communication services for two hours per month from a regional provider; (3) the Autism Consultant would visit Christopher's school twice weekly for the "first few months;" (4) Christopher's report card would use his current goals; (5) all work would be presented at Christopher's level; and (6) the school would fully implement Christopher's Behavior Management Plan. None of these services was provided as specified in the IEP.

At Christopher's initial hearing challenging the implementation of the IEP, the Administrative Law Judge properly began its inquiry with the question, "Did the District fail to implement [Christopher's] Individualized Education Program?" It then went a step further, however, asking, "If so, did that failure result in a loss of educational opportunity such that [Christopher] has been denied a Free and Appropriate Public Education." The district court and the majority appear to follow this same sequence of questions. Yet, only the first question is relevant. Having determined that the school district failed to implement the IEP, our inquiry must end.

The IEP Team crafted the IEP with an eye toward providing Christopher with FAPE. Any subsequent deviation is necessarily material. For example, Christopher's IEP Team concluded that the aide who spent all day, every day with this severely autistic child must be trained by the State in working with autistic children. If the IEP Team had determined, as the majority has, that it was sufficient to have the aide attend "local autism classes and meet with individuals who had worked with [Christopher] in the past," it would have explicitly stated as much in the IEP. The majority also finds it excusable that the school district did not work toward all of Christopher's short-term objectives, "given the extremely large number of such objectives." If the IEP Team thought fewer objectives were sufficient to provide FAPE, it could have included fewer.

Not having met with Christopher and worked extensively on his educational needs, this panel is not in a position to determine whether any of these failings was material. We do know, however, that Christopher's IEP Team, made up of twelve members including representatives of the district, thought that each of these measures was sufficiently important to be included in the IEP. We should not now second-guess whether such inclusions, or the failure to provide them, were material.

**IV.**

I would reverse the district court and hold that the school district's failure to fully implement the IEP, to which it expressly assented, violates the IDEA.