In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1790

CTL, a minor, by his Guardian ad Litem
Chris J. Trebatoski, ERIC LINDMAN, and
NICHOLE LINDMAN,

*Plaintiffs-Appellants*,

*v.*

ASHLAND SCHOOL DISTRICT,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 10-CV-300-wmc — **William M. Conley**, *Chief Judge*.

ARGUED SEPTEMBER 23, 2013 — DECIDED FEBRUARY 19, 2014

Before EASTERBROOK, SYKES, and TINDER, *Circuit Judges*.

SYKES, *Circuit Judge*. A diabetic student and his parents sued his former public-school district for discriminating against him on the basis of his disability. The district court granted summary judgment in favor of the school district, and we affirm.

None of the evidence or allegations demonstrate either intentional discrimination or a failure by the school district to reasonably accommodate his diabetes.

## I. Background

Charlie[1] Lindman is a child with Type 1 diabetes. He manages his condition with an insulin pump, a personal diabetes manager, and a continuous glucose monitor. The insulin pump delivers a steady dose of insulin and can also deliver a larger dose (bolus) on demand through the personal diabetes manager. The glucose monitor tracks Charlie's blood-glucose level and sets off an alarm if it goes above or below certain thresholds. The glucose monitor is not perfectly accurate, so a blood-glucose test is often required. If Charlie's blood-glucose level is high, he is given insulin via the personal diabetes manager, and if low, he is given a snack.

Before Charlie entered kindergarten, his parents, Eric and Nichole Lindman, worked with the Ashland School District to develop a plan (called a 504 plan) to accommodate Charlie's disability and enable him to attend public school. Charlie's 504 plan incorporated his doctor's orders for how insulin doses and snacks were to be administered at school. Another portion of Charlie's 504 plan required his school to train three adult staff members as "Trained Diabetes Personnel." These staff members had to be trained to administer insulin using Charlie's insulin pump, to monitor and respond to the alarms

---

[1] A pseudonym.

from his glucose monitor, and to respond to hyper/ hypoglycemia, among other things. The plan also required that all staff members who would interact with Charlie be given general training about diabetes and how to respond to certain situations.

Prior to Charlie's first day in kindergarten, the school hired Barb Vincent, a licensed nurse, to perform Charlie's diabetes care. The school also provided two separate training sessions: one general session that almost all staff who would interact with Charlie attended,[2] and a second session specific to Charlie's equipment that the majority of those same staff attended.

The Lindmans were mostly satisfied with the school throughout their son's kindergarten year, except that they believed Vincent was the school's only staff member who had the proper training to be qualified as Trained Diabetes Personnel. Nichole communicated with the school many times about the matter, but never received a satisfactory response.

The following school year, the situation deteriorated. After the school hired Pam Webber as the school-nurse supervisor, disputes arose between Webber, the Lindmans, and Vincent over how to manage Charlie's condition. Vincent would occasionally deviate from the insulin dosage recommended by the personal diabetes manager. She communicated these decisions to the Lindmans, who approved of her exercising judgment on a case-by-case basis. Webber, on the other hand,

---

[2] The parties dispute whether a few particular staff members attended the general training session as required.

believed that Wisconsin law required strict adherence to doctors' orders and did not allow school nurses to follow parents' instructions. Webber contacted Rachel Gallagher, a school-nurse consultant for the Wisconsin Department of Public Instruction, who agreed with Webber's interpretation of Wisconsin law. Gallagher also suggested that Webber contact Charlie's medical team for clarification on whether the school was permitted to modify insulin doses as the Lindmans desired, but it's unclear whether Webber actually did so.

In the fall of that school year, the Lindmans filed a complaint with the Department of Education's Office of Civil Rights, arguing that the school was violating the 504 plan by failing to have three Trained Diabetes Personnel and refusing to allow Vincent to adjust insulin doses on a case-by-case basis. They also accused Webber of obstinacy and failing to communicate with them about Charlie's treatment.

Vincent also found Webber frustrating to work with. When Vincent prodded her to learn more about the personalized care required by Charlie, Webber responded: "I'm an R.N., I can figure it out." On one school day, Vincent handed off care of Charlie to Webber. Prior to leaving, Vincent warned Webber that Charlie was trending high. When she returned, Vincent discovered that Webber had given Charlie a fruit roll-up during gym, setting off the alarm on his glucose monitor and requiring Vincent to administer an extra dose of insulin. Vincent rebuked Webber for this. Webber responded that Vincent had no right to question her treatment and from then on refused to talk to her.

Shortly thereafter, Vincent was reprimanded by the school administration for being rude in her interactions with coworkers. The school cited three separate examples, all stemming from her treatment of diabetic children. She disputed the claims and tried to explain her actions in a letter, but she was told that she needed to be more diplomatic or might be discharged. After reaching an impasse in her attempts to address the complaints, Vincent decided to resign.

After Vincent's resignation on November 5, a nurse assigned to the third through fifth grades was transferred and took over Charlie's care until the school hired two more nurses on January 18. During this time, the Lindmans grew increasingly frustrated with the school's communication and continued refusal to adjust his treatment on a case-by-case basis. Around January 25 the Lindmans decided, with the approval of their doctor, to send Charlie to school with edible fast-acting glucose to allow him to self-treat if he was feeling low. Webber again felt that this violated Charlie's 504 plan, so the nurses requested a doctor's order, but due to a mix-up, the school did not immediately receive the doctor's orders.

On January 29 the school entered into a mediation agreement with the Lindmans to resolve the complaint they had filed with the Department of Education's Office of Civil Rights. The agreement required the school to conduct training for Webber and two other nurses by February 28. It also more generally required the school to follow the 504 plan.

On February 11 the school followed up with the Lindmans and Charlie's doctor about the fast-acting glucose. The next day Charlie's doctor faxed an order (at 4:12 p.m., after the

school day ended) that permitted Charlie to eat "15 grams of carbohydrates that he [would] have with him" in the event of a low-sensor alarm from his glucose monitor. Prior to the receipt of the order, the school had a Valentine's Day party. Webber had taken Charlie's fast-acting glucose away from him and told him that a nurse would have to sit with him all day if he kept it. The Lindmans may have been confused over which happened first because they claim it was taken away in violation of Charlie's doctor's orders.

The following Monday, February 15, was a holiday. Charlie attended school on the 16th, but his parents called him in sick on the 17th and 18th. Also on the 18th, the Lindmans met with the school nurses and confronted them with Webber's actions on the 12th and 27 additional alleged violations of the 504 plan that Nichole had charted between January 25 and February 12.[3] The meeting was unsuccessful, and the Lindmans removed Charlie from the school that very day.

The Lindmans placed Charlie in a private Catholic school with no nurses or medically trained staff and no formal plan for diabetes care for him. The Lindmans then filed a lawsuit on Charlie's behalf alleging disability discrimination in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,

---

[3] The Lindmans briefly mention this chart in the fact section of their brief, but they don't describe any of the violations or how significant they were, nor do they connect them to their claim of disability discrimination. We ignore these additional allegations in our analysis. FED. R. APP. P. 28(a)(8)(A); *e.g.*, *Yasinskyy v. Holder*, 724 F.3d 983, 989 (7th Cir. 2013) ("We will not entertain baseless and unsupported factual contentions or undeveloped legal arguments … .").

and section 202 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132, requesting both an injunction against the school and damages for the cost of private school. The district court granted summary judgment in favor of the school, and the Lindmans appealed.

## II. Discussion

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to the Lindmans. *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.*; FED. R. CIV. P. 56(a).

Before addressing the merits of the appeal, we note a threshold jurisdictional question. During oral argument, we learned that the Lindmans had moved to a different school district, mooting their request for an injunction. *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006). When asked whether damages were available under the ADA or Rehabilitation Act, the parties were unable to provide a satisfactory answer, so we ordered supplemental briefing to determine whether the entire case was moot. As it turns out, though neither party cited it, the question is answered by *Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002), which recognized that compensatory damages are available in private causes of

action under the ADA and Rehabilitation Act, but held that punitive damages are not.[4] Therefore, we turn to the merits.

Section 504 of the Rehabilitation Act and section 202 of the ADA both prohibit discrimination against the disabled. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Section 202 similarly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Other than some minor differences not relevant here, the statutes are coextensive, so we refer to them

---

[4] We note that all circuits to consider the question have held that compensatory damages are only available for *intentional* discrimination, though there is a split over the appropriate standard for showing intentional discrimination. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260–65 (3d Cir. 2013) (listing cases, discussing the split, and adopting the majority standard). This issue is relevant because it would significantly limit recovery under one of the Lindmans' theories of liability (that Ashland failed to reasonably accommodate Charlie), which generally does not require a showing of intentional discrimination. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 562 (7th Cir. 2003) ("[R]easonable accommodation is a theory of liability separate from intentional discrimination."). We don't need to decide the appropriate standard for damages, however, because we hold that Ashland did not fail to reasonably accommodate Charlie.

collectively as section 504. *Washington v. Ind. High Sch. Athletic Ass'n Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999).

Ashland agrees that Charlie is a qualified individual with a disability, so the only dispute is whether the school discriminated against Charlie. To prove disability discrimination, a plaintiff must show that "'(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.'" *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (quoting *Washington*, 181 F.3d at 847). Accommodations are "only … required when *necessary* to avoid discrimination *on the basis of* a disability." *Id.* at 751. The Lindmans allege both intentional discrimination and a failure to accommodate Charlie, though they lean more heavily on the latter theory.

Disabled students in particular are entitled to reasonable accommodations that ensure them access to a "free[,] appropriate public education." 34 C.F.R. § 104.33(a). To meet this requirement, schools covered by section 504 must provide "regular or special education and related aids and services that … are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." *Id.* § 104.33(b). Schools like Ashland often create individualized plans describing the special services that will be provided to students to accommodate their disabilities.

The blueprints for these plans come from another statute, the Individuals with Disabilities Education Act ("IDEA"), which also requires states to provide a free, appropriate public

education. 20 U.S.C. § 1412(a)(1). States must implement the IDEA's requirement by developing "individualized education programs" ("IEPs") for disabled children, and the IDEA describes in detail what IEPs should contain and how they are to be developed. *Id.* §§ 1401(9), 1414(d). Section 504's regulations, on the other hand, do not require the implementation of an individualized plan (here, a 504 plan), but instead make this one method of meeting the section 504 requirement for a free, appropriate public education. 34 C.F.R. § 104.33(b)(2). Because section 504 defines disability more broadly than the IDEA, some students like Charlie are covered by section 504 but not the IDEA. *Compare* 20 U.S.C. § 1401(3) *with* 42 U.S.C. § 12102(1) (incorporated by reference in 29 U.S.C. § 705(9)(B)). Even for these students, many schools like Ashland choose to use individualized 504 plans.

When a school does adopt a 504 plan for a student, an important question follows: What is the effect of a plan violation? The Lindmans imply that any plan violation is sufficient for a claim of disability discrimination. Although we have found very few cases involving only 504 plans, circuit courts addressing failure-to-implement claims in cases in which IEPs were *required* (because the IDEA applied) have held that minor deviations do not automatically violate the IDEA. See *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 821–22 (9th Cir. 2007) (discussing similar Fifth and Eighth Circuit holdings). Furthermore, courts have found section 504's education requirement to be less exacting than the IDEA's. *See Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1246 (10th Cir. 2009) ("[A] denial [of a free, appropriate public education] under the IDEA does not

ineluctably establish a violation of § 504."); *Mark H v. Lemahieu*, 513 F.3d 922, 936 (9th Cir. 2008) (same); *Weber v. Cranston Pub. Sch. Comm.*, 245 F. Supp. 2d 401, 406 (D.R.I. 2003) ("[Section 504] is a bludgeon to the IDEA's stiletto, protecting a broader swath of the population without describing a precise manner of compliance."); *see also Timms ex rel. Timms v. Metro. Sch. Dist.*, 722 F.2d 1310, 1317–18 (7th Cir. 1983) (comparing section 504 to the Education for All Handicapped Children Act, the precursor to IDEA). So, for 504 plan violations to constitute disability discrimination, they must be significant enough to *effectively* deny a disabled child the benefit of a public education. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("[A] benefit … cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations … may have to be made."); *Wis. Cmty. Servs.*, 465 F.3d at 746–53.

Ashland emphasizes that Charlie regularly attended school, performed well, and suffered no adverse health consequences during his time at the school. This evidence weighs against the failure-to-accommodate claim, but it does not foreclose it. The Lindmans allege that they withdrew Charlie because they felt he was unsafe, and in certain circumstances a school's failure to provide a reasonably safe environment could effectively deny a disabled student the benefit of a public education. Parents do not need to wait until their child has been harmed to prove that the environment was unsafe. Ashland's actions in this case, however, do not come anywhere near this line.

The Lindmans first fault Ashland for failing to provide three Trained Diabetes Personnel as required by Charlie's 504 plan. They maintain, as they have ever since Charlie started kindergarten, that the school only had one, Barb Vincent. The district court found—and the school district argues on appeal—that the training session specific to Charlie's devices qualified all who attended the session as Trained Diabetes Personnel, fulfilling the plan requirement. However, Vincent declared that she was the only staff member who was fully qualified as Trained Diabetes Personnel and pointed to the fact that she was not allowed to take a lunch as evidence that the school had the same understanding. On one occasion when Vincent was out, the Lindmans were required to come pick Charlie up. Also, the agreement that resolved the Lindmans' complaint with the Department of Education required the school to train three staff members on Charlie's devices, implying that there weren't three Trained Diabetes Personnel prior to that time. Reviewing this evidence in the light most favorable to the Lindmans, we are unable to draw the same conclusion the district court did. But even assuming that Vincent was the school's only staff member who qualified, the 504 plan merely requires that "[e]ither a school nurse or [Trained Diabetes Personnel] … be present at all times during school hours," and only once was that requirement not met. For this reason the school district's failure to train two additional staff members as Trained Diabetes Personnel (assuming that's a correct interpretation of the facts) was at most a minor violation of the 504 plan and in no way made Charlie unsafe or denied him the benefit of a public education.

The only other failures the Lindmans point to are the school's refusal to adjust insulin bolus doses on a case-by-case basis or allow Charlie to self-treat with edible fast-acting glucose. Both issues boil down to disputes over Charlie's doctor's orders. With respect to insulin dosing, the orders are confusing: They say to "[u]se [the personal diabetes manager] Bolus Calculator for all insulin dosing" but also that "[Charlie's] parents are authorized to adjust the insulin dosage at any time." The Lindmans believe these orders gave them the final say regarding Charlie's treatment, while Webber believed that Wisconsin law prohibits schools from following parents' instructions over doctors' orders, even if parents can adjust the dosage themselves. The district court interpreted the orders as authorizing the Lindmans to adjust the *base* insulin dosage, but not bolus doses, which would justify the school's actions. Whatever the correct interpretation of Charlie's doctor's orders and Wisconsin law, the school's refusal to deviate from the dosage calculator was not unreasonable, and there is insufficient evidence that it made him unsafe. The Lindmans could have resolved the dispute by obtaining more flexible doctor's orders.

As for the self-treating conflict, Charlie's original doctor's orders did not allow him to self-treat. Although the Lindmans obtained a new set of orders before sending him to school with edible glucose, Ashland did not receive them until late in the day on February 12, *after* the Valentine's Day party when Webber supposedly violated his doctor's orders by taking the glucose away from him. And Charlie only attended one more day of school before the Lindmans finally removed him, leaving no evidence that the school would fail to comply with

the new orders. So again nothing in this dispute amounts to a failure to reasonably accommodate Charlie. If anything it shows that the school *was* accommodating him; after all, it was the school nurses who followed up with Charlie's doctor about the new set of orders.

Finally, the Lindmans accuse the school of intentional discrimination. Their theory is that Ashland purposefully frustrated the Lindmans in order to drive them out of the school so that Ashland would no longer have to deal with Charlie's disability. The evidence of such an orchestrated scheme is sparse. The Lindmans point to two comments by Ashland's Director of Pupil Services describing Charlie's mom as the "Lindman storm" and "hurricane Nicky." They also argue that the events surrounding Vincent's resignation demonstrate the school's unwillingness to listen to concerns regarding Charlie's diabetic care, even though Vincent was reprimanded for interactions with coworkers that were unrelated to Charlie. The rest of their argument reduces to little more than complaints about Webber's personality — specifically, her "rigid interpretation" of Charlie's doctor's orders and "callous and indifferent" attitude. A reasonable fact finder *might* agree with the Lindmans that Webber and other school staff were difficult to work with, communicated poorly, and took too rigid a view of Charlie's 504 plan and diabetic care in general. Still, none of this is enough for a jury to conclude that the school intentionally discriminated against Charlie.

AFFIRMED.